UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

ARTHUR NIGRO,

               Petitioner

      -against-

UNITED STATES OF AMERICA

            Respondent

———————————————————————

15 Civ. 3444 (PKC)

Related Criminal Action:
09 Cr. 1239 (PKC)


MEMORANDUM OF LAW IN SUPPORT OF ARTHUR NIGRO'S
MOTION TO VACATE JUDGMENT PURSUANT TO 28 U.S.C. § 2255

Ruth M. Liebesman (RL 5383)
30 Wall Street, 8th Floor
New York, New York 10005
212-804-5740
- - - - - - - - - - - - - - - - - - - - - -
36 Farview Terrace
Paramus, New Jersey 07652
201-617-7000
201-617-7710 (facsimile)
201-787-6002 (mobile)
RuthLiebesman@aol.com

TABLE OF CONTENTS

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Procedural History.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

The Trial Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A.      The Testimony of Mitchell Weissman. . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.      Weissman on Loansharking in Florida.. . . . . . . . . . . . . . . . . . . . . . . 5

B.      The Testimony of Anthony Arillotta. . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        1.      Arillotta on The Plot to Kill Frank Dadabo. . . . . . . . . . . . . . . . . . . 7

        2.      Arillotta on the Plot to Kill Louis Santos.. . . . . . . . . . . . . . . . . . . . 9

        3.      Arillotta on the Murder of Adolfo Bruno.. . . . . . . . . . . . . . . . . . . 10

        4.      Arillotta on Extortion in Massachusetts.. . . . . . . . . . . . . . . . . . . . 10

        5.      Arillotta on the Conspiracy to Extort the Gants.. . . . . . . . . . . . . . . 11

C.      The Testimony of Felix Tranghese.. . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.      Tranghese on the Murder of Adolfo Bruno. . . . . . . . . . . . . . . . . . . 13

        2.      Tranghese on Extortion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

D.      The Testimony of Frank Dadabo. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

E.      The Testimony of Frankie A. Roche.. . . . . . . . . . . . . . . . . . . . . . . . . . 17

Table of Contents (cont.)

      1.     Frankie Roche on the Murder of Adolfo Bruno . . . . . . . . . . . . . . . 18

F.     John Bologna . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Discovery Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

The *Brady* Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

A.     Frankie Roche's *Brady* Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B.     3500 Material Regarding John Bologna . . . . . . . . . . . . . . . . . . . . . . . . 25

Motion to Continue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

The Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Point One:   The Government Suppressed Exculpatory Information in
             Violation of the Due Process Clause and, Mandating Nigro's
             Petition Be Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Point Two:   To the Extent it Was Not Caused by the *Brady* Violation, Arthur
             Nigro Was Deprived of His Constitutional Right to the Effect
             Assistance of Counsel When His Attorney Failed to Impeach John
             Bologna and Other Witnesses under Fed.R.Evid. 806 . . . . . . . . . . . 32

A.     The Need to Impeach Bologna . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.     The FBI Reports of a "Confidential Human Source" . . . . . . . . . . . . . . 37

C.     Reports on the Hierarchy of the Genovese Crime Family . . . . . . . . . . . 39

D.     Colloquy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Table of Contents (cont.)

E.      Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        1.      John Bologna Should Have Been Cross-Examined With Regard
                to His Inconsistent Statements. . . . . . . . . . . . . . . . . . . . . . . . . 45

        2.      Counsel Should Have Examined the Agent About Bologna's
                Criminal Behavior and Continued Crimes While Acting as an
                Informant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

        3.      Counsel Was Ineffective For Failing to Utilize Rule 806 With
                Regard to James Santaniello. . . . . . . . . . . . . . . . . . . . . . . . . 50

F.      The Standards for Ineffective Assistance of Counsel. . . . . . . . . . . . . . 52

        1.      Defense Counsels' Failure to Utilize *Brady* Material Fell Below an
                Objective Standard of Reasonableness, Rendering Their Performance
                Ineffective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

        2.      Trial Counsel's Failure to Investigate and Use the *Brady* Evidence
                and 3500 Material Prejudiced Nigro Sufficiently to Meet the
                Second Prong of Strickland. . . . . . . . . . . . . . . . . . . . . . . . . . 56

        3.      The Failure to Impeach Arillotta and Tranghese on the Alleged
                Presentence Report Rendered Counsel's Assistance Ineffective. . . . 58

        4.      Defense Counsels' Failure to Obtain Nigro's Medical Records
                for 2002 to 2003 Rendered Their Performance Ineffective. . . . . . . 62

        5.      Defense Counsel Failed to Obtain The Docket of Nigro's Earlier
                Case to Refute Arillotta's Testimony. . . . . . . . . . . . . . . . . . . . 66

        6.      Defense Counsel Failed to Bring Out the Government's Prior
                Version of Nigro's Alleged Role in the Genovese Crime Family
                in Two Earlier Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Table of Contents (cont.)

A.    The Title III Application Regarding John Ardito. . . . . . . . . 66

B.    The Prior Indictment Against Arthur Nigro.. . . . . . . . . . . . . 70

Point Four:  Arthur Nigro Joins in the Memorandum of Law Filed by Fotios
Geas in Support of His Motion to Vacate, with Regard to All
Issues in Common. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Exhibit List. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

TABLE OF AUTHORITIES

Cases:

*Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed.2d 2 (1963). . . . . . . . 29

*Espinal v. Bennett*, 588 F. Supp. 2d 388 (E.D.N.Y. 2008),
    *aff'd*, 342 F. App'x 711 (2d Cir. 2009). . . . . . . . . . . . . . . . . 53, 54, 55, 56, 58

*Eze v. Sekowski*, 321 F.3d 1000 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Henry v. Poole*, 409 F.3d 48 (2d Cir.2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 57

*Kyles v. Whitley,* 514U.S. 419, 115 S. Ct. 1555, 131 L. Ed.2d 490 (1995). . . 29, 31

*Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001). . . . . . . . . . . . . . . . . 54, 55, 56-57

*Mak v. Blodgett*, 970 F.2d 614 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Mayo v. Henderson*, 13 F.3d 528 (2d Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Murden v. Artuz*, 497 F.3d 178 (2d Cir.2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Pave v. Hollins*, 261 F.3d 210 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 53-54

*Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . 57, 58

*Schulz v. Marshall*, 528 F. Supp.2d 77 (E.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . 55

*Sparman v. Edwards*, 26 F. Supp.2d 450, 452-53 (E.D.N.Y.1997). . . . . . . . . . . 55

*Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052,
    80 L. Ed.2d 674 (1984). . . . . . . . . . . . . . . . . . . . . . . . . 52-53, 53, 55, 56, 57

*Towns v. Smith*, 395 F.3d 251 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Table of Authorities (cont.)
Cases (cont.)

*United States v. Agurs,* 427 U.S. 97, 96 S. Ct. 2392,
    49 L. Ed.2d 342 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31

*United States v. Bermudez,* 526 F.2d 89 (2d Cir.1975), *cert. denied,*
    425 U.S. 970, 96 S. Ct. 2166, 48 L. Ed.2d 793 (1976). . . . . . . . . . . . . . . . 30

*United States v. Burton*, 937 F.2d 324 (7th Cir. 1991). . . . . . . . . . . . . . . . . . 48

*United States v. Diaz,* 922 F.2d 998 (2d Cir.1990), *cert. denied,*
    500 U.S. 925, 111 S. Ct. 2035, 114 L. Ed.2d 119 (1991). . . . . . . . . . . . . 30

*United States v. Esposito,* 834 F.2d 272 (2d Cir.1987). . . . . . . . . . . . . . . . . . 30

*United States v. LeRoy,* 687 F.2d 610 (2d Cir.1982), *cert. denied,*
    459 U.S. 1174, 103 S. Ct. 823, 74 L. Ed.2d 1019 (1983). . . . . . . . . . . . . 30

*United States v. Traska*, 962 F. Supp. 336 (E.D.N.Y. 1995). . . . . . . . . . . . . 46, 47

*United States v. Uvino*, 590 F. Supp.2d 372 (E.D.N.Y. 2008). . . . . . . . . . . . . . . 46

*United States v. Wuagneux*, 683 F.2d 1343 (11th Cir.),
    *cert. denied,* 464 U.S. 814, 104 S. Ct. 69, 78 L. Ed.2d 83 (1982). . . . . . . . 47

*United States v. Zackson,* 6 F.3d 911 (2d Cir.1993). . . . . . . . . . . . . . . . . . . . . 30

*Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527,
    156 L. Ed.2d 471 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

Statutes and Constitutional Provisions:

18 U.S.C. § 1951. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Table of Authorities (cont.)
Statutes and Constitutional Provisions (cont.)

18 U.S.C. § 1952. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1959. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1962. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Fed.R.Evid. 806. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 32, 45

Rule 3500. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

U.S. Const. Amend. 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 53

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

ARTHUR NIGRO,

                Petitioner

        -against-

UNITED STATES OF AMERICA

                Respondent

———————————————————————

15 Civ. 3444 (PKC)

Related Criminal Action:
09 Cr. 1239 (PKC)

## PROCEDURAL HISTORY

        Arthur Nigro and his co-defendants, Fotios and Ty Geas were indicted on racketeering conspiracy and related charges. That indictment was superseded, after which the three defendants were tried to a jury before the Honorable P. Kevin Castel in the United States District Court for the Southern District of New York.

        On April 1, 2011, Mr. Nigro was found guilty of Count One (RICO Conspiracy, contrary to 18 U.S.C. § 1962(d) (Count One)) (with the jury finding that Mr. Nigro did conspire to murder and/or aid and abet in the murder of Adolfo Bruno); Count Two (RICO Substantive, contrary to 18 U.S.C. § 1962(c)) – with the jury finding that Racketeering Act One (Murder and Conspiracy to Murder Adolfo Bruno), Racketeering Act Three (Conspiracy to Murder and Attempted Murder of

-1-

Frank Dadabo), Racketeering Act Four (Conspiracy to Murder Louis Santos); Racketeering Act Six (Extortion of and Conspiracy to Extort James Santaniello), Racketeering Act Eight (Conspiracy to Extort and Attempted Extortion of Michael and Anthony Grant) and Racketeering Act Nine (Loansharking in Florida) were proved; Count Four (Murder of Adolfo Bruno in Aid of Racketeering, contrary to 18 U.S.C. § 1959(a)(1)); Count Six (Extortion Conspiracy, contrary to 18 U.S.C. § 1951) and Count Seven (Interstate Travel in Aid of Racketeering, 18 U.S.C. § 1952) Nigro (and the Geases) was acquitted of Count Three (murder of Adolfo Bruno to Obstruct Justice) (Verdict Sheet at A62-65)

On September 12, 2011, Nigro was sentenced by Judge Castel to life imprisonment on Counts 1, 2 and 4, with 240 months to run concurrently on Counts 6 and 7, with 3 years of supervised release on each count to run concurrently. A special assessment of $500 was imposed. The fine was waived. Forfeiture in the amount of $234,000 was imposed. (Judgment at A66-72)

A Notice of Appeal was timely filed. (A73) Nigro's direct appeal was denied, and a Petition for Rehearing and Suggestion for Rehearing *En Banc* was denied February 18, 2014. Mandate issued on March 6, 2014. No Petition for Writ of Certiorari was filed with this United States Supreme Court.

This Petition for Writ of Habeas Corpus timely ensues.

-2-

<u>STATEMENT OF FACTS</u>

The government's case was based upon the testimony of four cooperating witnesses, all career criminals with two, Anthony Arillotta[1]  and Felix Tranghese, being reputed "made members" of the so-called Genovese Crime Family; Arillotta claimed he became a member on August 11, 2003; (Tr. 457-6)[2] Tranghese became a member in 1982. (Tr. 1532)  Career criminals Frankie Roche and Mitchell Weissman (both purported associates of the Genovese Family) were the other two main witnesses for the government.  Roche did not know Nigro, and Tranghese, Arillotta and Weissman testified primarily about co-conspirator hearsay, much from John Bologna.  Arillotta, Tranghese, and Roche each faced life in prison when he decided to cooperate; each sought early release from prison based upon his testimony.

[1]   Arillotta's history of crimes and extreme violence includes selling drugs such as marijuana and cocaine; (Tr. 841; 942; 944-45) loansharking; shakedowns; extortion; (Tr. 758; 842) money laundering; (Tr. 845) highjacking; robbing trucks; (Tr. 942) bookmaking; "[m]aybe half a dozen" beatings (excluding bar fights) (Tr. 909-10); and tax evasion (Tr. 83 9) Arillotta shot the dog of a person with whom he was angry; (Tr. 910) and, unknown to Nigro, beat Frank D'Agostino. (Tr. 934)

Arillotta was arrested in February of 2010 and charged with the murder of Adolfo Bruno (Tr. 1107) and almost immediately became a government witness. (Tr. 810) Arillotta had a wife, a girlfriend, and had sex with his wife's sister (Tr. 982)   He kept $80,000 after he was arrested and cooperated, although claims that he told the government about this money. (Tr. 863-65)

[2]   Numbers preceded by the letters "Tr." refer to the page of the trial transcript where the matter referred to may be located.

-3-

Each of these four admitted criminals and liars had strong motivation to lie. Nevertheless, Roche admitted he did not know of Nigro and Tranghese testified that he never said Nigro was "acting boss." (Tr. 1660)

THE TRIAL TESTIMONY

A.    <u>The Testimony of Mitchell Weissman.</u>

Mitchell Weissman, a career criminal and career liar, moved to Florida in 1987 and claimed to have been involved with organized crime ("the Genovese crime family") "on a daily basis" from 2001 through 2006, when he was arrested. (Tr. 300-01) In 2007, Weissman[3] was sentenced to 96 months in federal prison for "[c]onspiracy, RICO, conspiracy, extortion, loan sharking, money laundering and conspiracy to commit robbery." (Tr. 371) He began cooperating in 2007, had his sentenced reduced to 48 months, and was released in 2009. (Tr. 372-74) The federal government also provided Weissman with $25,000.00 in "moving expenses" when he was released from prison. (Tr. 378)

Despite the lack of any *voir dire* as to the source of his knowledge or his supposed expertise (or any expert report), Weissman was permitted, over repeated

---

[3]    Weissman, aged 58, was convicted in the late 1970's in Massachusetts of "a RICO Conspiracy; receiving stolen property, aiding and abetting a bankruptcy fraud" and of importing 15,000 pounds of marijuana, for which he received a 2 year jail sentence (from 1980 to 1981) (Tr. 298-99) He was convicted of larceny in the mid-1980's. (Tr. 300)

objections (Tr. 302; 304; 305; 306) to testify that the Genovese Crime Family is the largest of the five organized crime families in the New York City area, with about 200 members (Tr. 304) and that he was an associate.  Above associates were "made" members, who must be Italian. (Tr. 303-05)  Above "made men" are "Captains" or "skippers," responsible for the "crew," who made members and associates) (Tr. 305-06) Above Captains are "Bosses," who "make the decisions for the . . . family." (Tr. 306)  When a boss is "incapacitated" or cannot fill his position, the Genovese family appoints temporary, or "Acting" positions. (Tr. 306-07)

Weissman testified that Nigro is a member of the Genovese family. (Tr. 307)  He claimed that Nigro was known as "the Little Guy," and that Adolfo Bruno was in charge of the Genovese family in Massachusetts, from 2001 to 2003, with Nigro overseeing the family's Massachusetts operation from New York City. (Tr. 346)  It was Weissman's claim that Nigro became acting head of the family, or boss, in 2002 or 2003. (Tr. 426)

1.     Weissman on Loansharking in Florida.

Weissman testified that after Bruno was killed, he borrowed money from Ray Ruggiero in Ruggiero's office in Juno Beach, Florida. (Tr. 310) Weissman testified "Ray had to answer to Artie." (Tr. 313)

Weissman claimed he ended up borrowing "[a]bout $40,000" from

Ruggiero, (Tr. 314) and became associated with Ruggiero's crew, which loaned money at illegal interest rates. (Tr. 315-22) Weissman claimed that, at one point, Nigro ruled that 30 or 35 thousand dollars that Bruno had on the street would go to Ruggiero "to make up for . . . Ray's tax liability." (Tr. 354-55) Weissman testified that Ray (and others) told Weissman not to do business with Bruno any longer, as supposedly ordered by Nigro. (Tr. 355-56)

Weissman testified he first met Nigro in 2002 at a restaurant in Deerfield Beach, Florida.  Ruggiero advised Weissman that Nigro wanted to sent $20,000 down to Florida "to put out" on the street.  When the money was received, it was lent to a Michael Korditch, who had a company called OPSYS Technologies. (Tr. 326-28) Nigro also sent another $25,000 to Florida for Michael Korditch (and OPSYS Technologies) which turned out to be "a scam." (Tr. 331) Korditch was given "a few beatings" by Colassacco that were "[p]retty bad."  Nigro and Ruggiero got their money back and most of the investors wound up losing money. (Tr. 332-33)

B.    The Testimony of Anthony Arillotta.

Arillotta testified that Nigro, based in the Bronx, was his "boss" and inducted him into the family." (Tr. 326; 462) In approximately 2001, Nigro put Bruno in charge of the Springfield, Massachusetts Genovese faction. (Tr. 1552; 517-18) Other made members at the time were Felix Tranghese and Emilio Fusco. (Tr. 1562)

-6-

According to Arillotta, shortly Nigro appointed Bruno, John Bologna began traveling to Springfield to meet with Bruno to discuss business, claiming to be acting on Nigro's behalf.   According to Arillotta, Bologna wanted the Genovese family members and associates to start extorting more local businesses, including the Mardi Gras strip club. (Tr. 502-05)

After his arrest, Arillotta had up to 15 sessions of up to four hours each with government attorneys, preparing his testimony. (Tr. 786-87) He contended Nigro had ordered him "to go out and commit crimes." From 2001-2003 he had his own "crew" consisting of Fotios Geas and Ty Geas.  Arillotta threatened physical assaults in his conversations with Emo Gonzalez, which were secretly recorded. (Tr. 790-92)

Arillotta admitted that he never gave Nigro any money personally (Tr. 932) and neither spoke with him on the phone nor sent him an e-mail (Tr. 846) Nigro never stayed at Arillotta's home; Arillotta was never in Nigro's home, which was in the Bronx. (Tr. 849) Arillotta had people read articles about his case to him over the phone after he was arrested in 2010. (Tr. 1095)

1.    <u>Arillotta on The Plot to Kill Frank Dadabo</u>.

Arillotta testified that in early 2003 Nigro was made "acting boss" of the Genovese family because the boss Ernie Muscarella "was under indictment facing racketeering charges at the time." (Tr. 540-41) The testimonies Felix Tranghese and

Anthony Arillotta often conflicted with one another. Arillotta testified that sometime in the spring of 2003, he met with Nigro and Bologna in front of the Laundromat in the Bronx and Nigro told Arillotta he had "a piece of work" for him to do and Arillotta agreed. Nigro then showed Arillotta where Dadabo lived along with a description of his car along with Dadabo's morning routine. (Tr. 551-56) Arillotta believed it involved "some type of union beef" and that "the Lucchese family had some type of involvement with this union guy also." (Tr. 553)

Nigro wanted Arillotta to use two "proposed members" (Joey Basile and Reno Ceravolo) but they did not want to do it when Arillotta asked for their help. (Tr. 554-56) Arillotta then recruited the Geases and they agreed. (Tr. 557-58) Arillotta and the Geases traveled to the Bronx twice to scout the location (Tr. 559-62)

Arillotta testified that, before dawn on May 19, 2003, Arillotta and Ty Geas drove from Springfield to the Bronx and met Fotios Geas on the way, and proceeded to where Dadabo lived. (Tr. 562) Arillotta and Ty Geas waited on a bench outside Dadabo's apartment, while Fotios Geas waited in a getaway car. (Tr. 564-65) When Dadabo left his apartment, Arillotta and Ty approached him. When Dadabo entered his car, Ty began shooting into it. Arillotta's gun jammed. Dadabo appeared dead, and Arillotta and Ty fled in the car driven by Fotios, throwing the guns off a bridge. Fotios "made a comment that he was definitely dead." (Tr. 566-67)

Arillotta testified that he was inducted into the Genovese crime family "[a] few months" after, on August 11, 2003.  (Tr. 570)  He claimed that reporting directly to Nigro gave him "a lot of clout . . . a lot of power, being direct with Artie. He was the boss." (Tr. 586)

2.    Arillotta on the Plot to Kill Louis Santos.

Arillotta testified that in 2003 he was involved in a plot to kill Louis "Louis the Shoe" Santos, who was a friend of Arillotta's ("[w]e were close and we were together a lot everyday") who "worked for Bruno ... [Santos] was big in gambling, sports gambling business." (Tr. 621-22)

In 2001, Santos had been indicted and "we received information that he was cooperating with law enforcement." (622)  A private investigator was hired to follow Santos and he reported to Arillotta in 2002 that Santos "is an informant 100 percent." (Tr. 623-24) When informed of this, Bruno did not want to kill Santos but wanted to "keep him close" as he was making a lot of money with Santos. (Tr. 624)

Sometime in 2003, Arillotta met with Nigro and Arillotta "filled him in" on Santos.  After Arillotta advised Nigro that Bruno had "said to keep [Santos] around" Nigro "was angry" and "very upset." (Tr. 626) Arillotta testified "Nigro gave me an order to kill Louie." (Tr. 626)  He recruited the Geases into the plan to kill Santos, and they in turn recruited Frankie Roche. (Tr. 626)  Santos went to a medical

-9-

clinic daily for treatment for hepatitis C, and Roche was going to murder Santos as he left one of his appointments. (Tr. 627-28)

Roche discussed killing Louie Santos, "a rat," with the Geas. (Tr. 1254-55)  Roche was to be paid $10,000 to participate in the killing, which planned for outside a physical therapy office. (Tr. 1256-57) The plan was never carried out (Tr. 1260) and, according to Arillotta, "was called off for the murder of Al Bruno." (Tr. 628)

       3.     <u>Arillotta on the Murder of Adolfo Bruno</u>.

Arillotta testified Tranghese told him "to kill Bruno" and Arillotta agreed "just to appease him." (Tr. 644)  According to Arillotta, Felix Tranghese called John Bologna from a pay phone, and told Bologna that Bruno was a cooperator.  It was decided to bring a paper, a presentence report, to Arthur Nigro. (637-38) A few weeks later, according to Arillotta, Tranghese met Nigro outside the Laundromat in the Bronx.  Tranghese claimed Nigro told Tranghese to ask for Arillotta's help regarding "the thing with Bruno." (Tr. 645-46) Arillotta was not at this meeting. (Tr. 649)

Arillotta and the Geases discussed different plans to kill Bruno, deciding to use Frankie Roche.  (Tr. 647-55)  Fotios Geas then contacted Roche.

       4.     <u>Arillotta on Extortion in Massachusetts</u>.

Arillotta testified that in 2001 Bologna began coming to Springfield

-10-

"every weekend" and Bologna would meet with Bruno to "tell him that Arty and Pat said." (Tr. 503-04)  At a meeting in New York "Arty and Pat agreed that it was okay to get $500" from James Santaniello (the owner of the Mardi Gras Strip Club) and Jimmy Fiore (a businessman) (Tr. 504-05)

       Arillotta testified that after Bruno's murder Nigro told him that he should "should go into, aggressively . . . the vending machine business with the Joker Pokers in them" and Santaniello (who owned "multiple businesses") was approached. (Tr. 702-04) In the spring of 2004 Santaniello was told to pay Arillotta and the Geases $12,000 per month and he did so through an attorney named Daniel Kelly. (Tr. 707-08) Arillotta continued receiving money from Santaniello until late 2007.  He would send a portion to Nigro. (Tr. 764-65)

       Arillotta testified that he and the Geases, went "after all of Albert Schibelli's locations" (Schibelli was part of S&M Vending), along with other businessmen such as James Santaniello (Tr. 703-04) and the Sarnos, who were "just associates of the Genovese family;" (Tr. 705; 709) Michael Cimmino (706).  After being threatened physically, Santaniello began paying ($800 per month at first) (Tr. 1558)

     5.    <u>Arillotta on the Conspiracy to Extort the Gants</u>.

       Arillotta testified that in the beginning of 2004 Nigro ordered him and

-11-

Tranghese to approach the brothers Michael and Tony Grant (the owners of the Hustler Strip Club in New York City, along with other businesses) "and to tell them that they had to pay money." (Tr. 745-47) Arillotta, the Geases and Felix Tranghese planned to tell the Grants "that they had to pay 12,000 a week and if it got to that we had to put our hands on them and beat them or whatever . . ." (Tr. 750-51)  Arillotta also acknowledged that Nigro was not a boss when he met him and that Pat "Scop" DeLuca "was a high ranking captain in the Genovese family that would oversee Springfield's crew of the parts of the family." (Tr. 489; 491)

C.    The Testimony of Felix Tranghese.

Felix Tranghese[4] claimed to be a "made member" of the Genovese crime family since 1982. (Tr. 1532) He was arrested on July 23, 2010, and charged with the murder of Adolfo Bruno, racketeering and extortion.  He faced the death penalty and decided to cooperate on the day he was arrested. (Tr. 1528-29; 1531;  1725)

In January of 2011, Tranghese pleaded guilty to the murder of Adolfo

---

[4]    Tranghese testified he was "made" into the Genovese Family in 1982. (Tr. 1538-39) Tranghese was involved in an illegal lottery business and beat "[f]ive or six" people over mob business on behalf of the Genovese Family (Sam Cafari and Frank Schibelli) (Tr. 1535-36) Tranghese was placed on probation for a bar fight in the late 70's, and while on probation was arrested in Connecticut for carrying guns, for which he served 2½ years in state prison. (Tr. 1537-38) He was in federal prison from 1987 to 1991 after a conviction for racketeering and interstate commerce "for running junkets to Las Vegas." (Tr. 1542-43) Tranghese explained this included collecting debts that gamblers owed. (Tr. 1694-95)

Bruno, racketeering and extortion. (Tr. 1530) At the time of trial he had not yet been sentenced, and faced "up to life in prison." (Tr. 1531)

1.    <u>Tranghese on the Murder of Adolfo Bruno</u>.

Tranghese claimed that, in 2003, he met with Arillotta and Fusco, who had a "piece of paper" that said Adolfo Bruno was speaking with FBI Special Agent Cliff Hedges about Emilio Fusco. (Tr. 1563-64) Fusco wanted "to make a beef against Bruno." (Tr. 633-36)

Tranghese testified that Nigro ordered him to "to care of" Bruno, which he understood to mean have Bruno killed. (Tr. 1533; 1571)  He claimed Fusco, "a soldier, a made man" in the Genovese family in Springfield, (Tr. 1562) was arrested in 2002 by federal authorities.  In the **Spring of 2003**, Tranghese was asked to bring the "piece of paper" to New York.  He gave it to John Bologna in a hotel parking lot in Port Chester, New York. (Tr. 1563-64)

Tranghese testified Bologna told him he was going to give the paper to Nigro.  A few days later, Tranghese again met with Bologna in Port Chester and was brought to meet Nigro "in front of the Laundromat in the Bronx." (Tr. 1565-67) Nigro gave the paper back to Tranghese.  Section C was highlighted." (Tr. 1568) *Nigro told Tranghese he "was going to have to sit down with somebody else, other people and*

-13-

*explain that paper to 'em.*"[5]  (Tr. 1568)  Shortly after Tranghese went to a meeting at the Nebraska Steakhouse with Nigro, Bologna, and "some other guys."  They passed "the paper" around, and Nigro said he would get back to Tranghese. (Tr. 1568-70)

Tranghese was called to another meeting at the Nebraska Steakhouse. Nigro walked with Tranghese outside the restaurant and, according to Tranghese: "Artie told me that I should go back to Springfield and tell Anthony Arillotta and Emilio Fusco to take care of Bruno and to make sure that nothing would be found and for me not to have anything to do with it." (Tr. 1570-71)[6]

2.    Tranghese on Extortion.

According to Tranghese, beginning in 2001 the Genovese family in Massachusetts began getting money from strip clubs, extorting legitimate businesses for the first time. (Tr. 1554) Tranghese never gave any money to Nigro; he gave it to

---

[5]      This, of course, makes it very unlikely that Nigro was "in charge," as he would not have felt the need to report to someone else with "the paper."

[6]      Tranghese apparently learned Bruno wanted him killed, so Tranghese conspired with Arillotta and Bologna to kill Bruno first.  Admitted triggerman Frankie Roche had his own personal motivation for accepting Bologna's contract to kill Bruno: Roche had wrecked a Bruno owned bar and knew that Bruno was looking for him.  This is supported by the grand jury testimony of Anthony Schibelli, dated February 23, 2004, admitted into evidence by stipulation as Defendant's Exhibit DFGF; (Tr. 1841-42) that the Bruno killing was a personal matter between Roche and Bruno because of Roche's destruction of a bar owned by Bruno.  The day before Bruno's murder, Roche threatened to kill Schibelli while brandishing a pistol, and announced he was going to kill Bruno.

Bologna, believing that Bologna would give it to Nigro. (Tr. 1637)

Tranghese testified that in 2004, he extorted $800.00 per month from Carlo Sarno, owner of a vending business. Some would go to John Bologna, and Tranghese would keep some. Arillotta was also extorting Sarno. (Tr. 1584-90) Michael Cimmino, owner of a video vending business, paid Tranghese extortion money each month, with Tranghese keeping some and "some went into the pot to give to John [Bologna]." (Tr. 1590-92)

In about 2005, Tranghese "started getting passed up on everything" as Arillotta "was taking control of everything ... and pushing me to the side." (Tr. 1604-05) At one point, Bologna told Tranghese "not to do anything else around Springfield" and that Tranghese knew where it came from. Tranghese took that to mean that it came "from Artie." (Tr. 1605-06)

D.    The Testimony of Frank Dadabo.

Frank Dadabo, aged 68, a retired cement mason, joined Local 780 in 1970 (Tr. 1773-74; 1775-76) In the late 1990's Dadabo became shop steward and was also elected in 2002 to the examining board, which checked the books to ensure that the pension welfare money had come in from the companies. (Tr. 1779-80)

Dadabo first met Nigro in the mid 1990's on a construction site in lower Manhattan. He was a cement mason and Nigro was a shop steward. Dadabo saw

-15-

Nigro on other jobs, as well.  Nigro worked mostly with Pinnacle Construction. (Tr. 1781-83) Dadabo became friendly with Nigro and socialized with him, going to dinner and shows. (Tr. 1783)

Dadabo asked Nigro's assistance getting a shop steward job. (Tr. 1787-88)  Over defense objection, Dadabo testified that, based on his dealings with Nigro and Nigro's friends, he believed "[t]hat he was a made man in the Genovese family." (Tr. 1790)

Dadabo ended his friendship with Nigro over Tony Bennett tickets.  In 2002, Tony Bennett was going to perform at Radio City Music Hall, and a friend of Dadabo's named Anthony Benedetto got six tickets: for Dadabo and his wife, Nigro and his girlfriend Margaret, and Anthony Benedetto and his wife. (Tr. 1807) Dadabo became angry that Benedetto "never came around" when Dadabo campaigning for a seat on the examining board, for which Benedetto had nominated him.  Dadabo returns his tickets, and was angry that Nigro and his girlfriend went anyway.  Dadabo only saw Nigro one more time after that. (Tr. 1791-99)

Through Jack Pallela, secretary/treasurer of Local 780, Dadabo became shop steward for the Bloomberg building on 58th and 59th in Manhattan, a "high rise."  After taking this job, Dadabo was told to see Nigro, but did not. (Tr. 1794-96)

-16-

Six or seven months after he'd begun working on the Bloomberg job site, Dadabo was shot nine times in front of his house in the Bronx by a tall, skinny person. (Tr. 1796-99) He was in a wheelchair for two months, and in physical therapy for six months. Dadabo's injuries included nerve damage to his foot. A bullet remains in his lung and another in his chest,  He uses a "fibrillater twice a day for breathing" because his lung collapsed. (Tr. 1801)

Dadabo did not know who shot him. (Tr. 1796) He never worked again and no one from the union ever contacted him. (Tr. 1801-02)  The last time he spoke with Nigro was a "[c]ouple of months, maybe six months" prior to his being shot. (Tr. 1808) Dadabo never had any bad words with Nigro and always got along with him. (Tr. 1813) When the police asked Dadabo who shot him he honestly told them that he had no idea. (Tr. 1808) Dadabo testified that he believes he was shot "over work, over jobs.  I wanted a job and he wanted that job and I took that job.  That's what it was, I don't know why." (Tr. 1809)

E.    The Testimony of Frankie A. Roche.

Frankie Roche, "a nut" and "crash dummy" (Tr. 655) with about 20 criminal convictions (Tr. 1427) decided to cooperate in 2007 upon his arrest for the Bruno murder. (Tr. 1235) Roche admitted murdering Bruno and pled guilty to murder in aid of racketeering in April 2008. (Tr. 1230; 1237; 1439) He was already the proud

-17-

owner of an extensive criminal history and current history of violence, which did not

stop the F.B.I. from signing him up.[7]

1.     Frankie Roche on the Murder of Adolfo Bruno.

According to Roche, Fotios told him that, unlike the Manzi and Santos

---

[7]     Roche had a history of violent crime, beginning at age "12, 13" with arrests for "[s]tolen motor vehicles, breaking and entering, assault." He received a one year sentence in 1991 at 17 for auto theft, (Tr. 1240-41) 2 ½ years in 1992 for auto theft, breaking and entering, assault with a dangerous weapon (a golf club) and armed robbery. (Tr. 1241-42) He escaped from prison by stealing two motor vehicles, was sentenced to 6 to 8 years and was incarcerated from 1993 to 1998. (Tr. 1242-43) Roche was released in May of 1998 and was returned in April 2000 for breaking into a liquor store. (Tr. 1243) He was involved in a hit and run with his then girlfriend's car injuring the driver of a motorcycle. (Tr. 1365) In 2003 he was in a high speed chase with a 17 year old girl in the car, eluding the State Police, (Tr. 1295-96) approaching speeds of 100 miles per hour.  He ignored the girl's pleas for him to stop or slow down. (Tr. 1393-94)  After a twenty minute chase Roche struck a building, went down an embankment, and fled without checking on the girl. (Tr. 1397-98)  In 1992 Roche punched and choked a former girlfriend, Jennifer Avery, and kicked in her car windshield. (Tr. 1423)

Fotios asked Roche to beat a chiropractor and Roche did so, hitting him 10 or 12 times with a baseball bat. He received $1,000.00 from Ty Geas for this. (Tr. 1300-01)  Roche was in another bar fight and beat an individual  over a pool match at Emo's bar and "smashed everything in the bar that would break" with a baseball bat. (Tr. 1302-03)  He has seven tattoos, including "grim reaper" and "Fuck the police." (Tr. 1244)  He has a serious drinking problem that makes him violent. (Tr. 1368-69)

The federal government spent approximately $140,000 relocating Roche's wife and daughter. (Tr. 1236-37)  Roche also received a $150,000 settlement from the federal government due to an injury he received during his arrest in Tampa, Florida (Tr. 1424-25)  Roche's medical expenses were also paid by the government. (Tr. 1426)

murder plots, "[t]his one wasn't going to be on hold.  This one came from New York. It's been green lighted.  Nothing is going to stop this one.  It's got to be done.  It can't be messed up." (Tr. 1309)  Fotios promised Roche $10,000.00 for the murder, (Tr. 1308-09) and gave him two guns: a .380 and a .45 with an extra clip. (Tr. 1310-11) Roche had his own motivation for killing Bruno: he'd heard that Bruno held him responsible for the damage in the bar and wanted Roche to make restitution.  The Geases told Roche not to worry about it as he was going to kill Bruno. (Tr.1315-16)

Roche knew nothing of Arthur Nigro. He never met Arthur Nigro and knew no one by that name. (Tr. 1293)

F.    John Bologna.

John Bologna, who did not testify, had been cooperating with the federal authorities since 1996, including while running Genovese family operations in Springfield. (Tr. 1635-37) Bologna was the FBI's New York office's answer to Whitey Bulger, the crime lord who committed and ordered numerous murders and acts of violence while an FBI informant in Boston over a period of many years.

As explained by AUSA Lanpher: "Mr. Bologna was a confidential informant with the FBI beginning in around 1997 until around 2007 . . . He continued to commit a rash of crimes without telling the FBI . . . from September 2007 forward he began being debriefed by the government and wearing a recording device for

-19-

certain recordings." (Tr. 1734-35)

Special Agent Joy Adam confirmed that Bologna was an informant from approximately 1996 through 2006. (Tr. 1745-46) Bologna began wearing a wire for the FBI in 2007 (Tr. 1748-49) and on October 6, 2008, he surreptitiously recorded Nigro at Fort Dix (Tr. 1751-53) Much of the testimony of the Government's witnesses consisted of the alleged out-of-court declarations of John Bologna.

DISCOVERY PROBLEMS

At a pre-trial conference on August 26, 2010, the district court was alerted that the discovery had been voluminous, and much of it was on CD-ROMs. The Metropolitan Detention Center (MDC), where the defendants were incarcerated, however, had very limited equipment to permit the viewing of electronic discovery, resulting in the defendants being allotted at most 1 hour per week to review the discovery on the CD-ROMs.  Doc. 92 at 8.

The Government related that tens of thousands of pages of discovery material had been provided, and about a thousand hours of tape recorded wiretaps. Doc. 92 at 12-13. The district court continued the trial until March 8, 2011, due to the voluminous discovery. Doc. 92 at 17. The district court also instructed the government to contact MDC to ensure that adequate time and facilities to review the discovery would be available to the defendants. Doc. 92 at 18.

-20-

The MDC, however, never adhered to the Courts directive.

At a pretrial conference January 25, 2011, the defense asserted that the MDC had only provided the defendants limited time to use computers to review the discovery, which was mostly on disk. The defendants were afforded access one day a week for a few hours to use the computer to review discovery, while literally scores of other defendants with similar discovery issues vied to use the computer.

The district court noted the maximum library time was only 2.5 hours a week, and that the defense's point was valid. The court issued an Order mandating that MDC allow the defendants a minimum of 12.5 hours a week to use the law library's computer terminals. The defense related that this was still not enough time to review everything before trial and that more time was needed to prepare.

Significantly, to make matters even worse, the district court's order was not followed by MDC and the district court initiated contempt proceedings against the warden.

In a letter dated December 27, 2010, the Government informed defense counsel that it did not "currently expect to call John Bologna as a witness in its case in chief at trial." The Government advised that it "currently anticipates producing 3500 material on a rolling basis, beginning approximately one month before trial, and to be substantially completed two weeks prior to trial.  (Exhibit A)

THE *BRADY* VIOLATION

On February 9, 2011, thirty three days before the commencement of trial, the government gave the defense approximately six thousand (6,000) pages of new material it described as 3500 material. A.79. This was all new material and, unknown to the defense, contained substantial *Brady* material. This *Brady* material had been known to the government for months, if not years, before it was turned over to the defense on the eve of trial.

None of the *Brady* material described below was identified as such. That material included:

A.    Frankie Roche's *Brady* Material.

     1.    Report of Investigation dated: 4/23/2007 (Attached as Exhibit B):

          a.    Roche identifies "The Little Guy" as Anthony Arillotta, and states that the order to kill Bruno came from Port Chester, not "New York."

As we were talking, Freddy (GEAS) was telling me that the 'Little Guy' was going to have the city and they were going to take care of me  When he said the 'Little Guy' I knew that he was he was talking about ARILLOTTA.[8]

Freddy told me that the 'Little Guy' had gone to Port Chester and gotten the ok to kill BRUNO, and nothing was going to stop it.  Freddy told me make sure he was dead and not to fuck it up.

---

[8]    Weissman had testified that Nigro was "the Little Guy."

-22-

Exhibit B, pp. 3 & 4.  Bologna's business, where he met with his cohorts, was in Port

Chester, where the order came from.

By contrast, at trial Roche stated that the order to kill Bruno came from

"New York."

Q.      And did Freddie Geas say anything else to you about the murder
        plan?

A.      Yeah. He said he was excited. He -- I could tell he really wanted
        to get this done to take care of this. He told me the Giuseppe
        Manzi thing had been on hold.  This one wasn't going to be on
        hold. This one came from New York. It's been green lighted.
        Nothing is going to stop this one. It's got to be done. It can't be
        messed up. ...  I had to pick the guns up but once I got the guns it
        was a go.

(TT.1309)

b.      Roche Identifies a photograph of Arillotta as "The Little Guy,"
        and reiterates that the order to kill Bruno came from Port Chester.

The third array I looked at all eight photos and I told the
detectives that photo number six is a photo of 'Little Guy.'
I know that his real name is Anthony ARILLOTTA.  I
know Freddy was talking about ARILLOTTA when Freddy
told me that the 'Little Guy' had gone to Port Chester and
gotten the ok to kill BRUNO.

As noted above, this Report of Investigation (Exhibit B) was dated April

23, 2007, almost 4 years before Nigro and his co-defendants stood trial.  Yet, it was

provided to the defense on the eve of trial, after trial strategy had been solidified and

-23-

other hearings were being prepared.  There was no time to fully review 6,000 pages

of additional material in a search for unidentified *Brady* material.

       2.    <u>FBI File USA0-00006566 page 6563 date: 4/16/2007 (also labeled 281A-BS-93627-302) (Exhibit C)</u>[9]

       ROCHE advised that EMILIO FUSCO, made member of Genovese, was involved in the BRUNO murder in that he knew that it was going to happen and aided with the surveillance of BRUNO.  FRED GEAS told ROCHE that ROCHE was driving around the Mt. Carmel Club too often, and that people would get suspicious.  GEAS told ROCHE that EMILIO FUSCO was part of the plan, and that he was on the look-out for BRUNO and that he would help locate BRUNO.  ROCHE stated that FRED GEAS told him that **ANTHONY ARILLOTTA's guy in Port Chester was JOHN BOLOGNA, also known as "J.B.," and that Port Chester had sanctioned the murder**.

(Exhibit C)[10] Thus, the order to kill Bruno came from Bologna, not Nigro.  There can

be no question that the withholding of this material document prejudiced Nigro.  See

also Exhibit D, the type-written statement of Frankie Roche, which also names

Arillotta and "the Little Guy" and states that the order to kill Bruno came from Port

Chester.

---

    [9]      We note that pages are missing from the document attached as Exhibit C.  Counsel herein does not know whether it was missing from the documents provided by the government or was subsequently lost by prior counsel or Mr. Nigro.

    [10]      Arillotta also testified at the trial that he would meet Bologna in Port Chester, New York at Bologna's social club. (TT536)

Although defense counsel asked Roche if, by New York he meant Port Chester, and Roche responded affirmatively, counsel made no effort to delve further into the fact that the order to kill Bruno came from Port Chester, and Port Chester meant John Bologna.

It must again be noted that this document is dated April 16, 2007, nearly four years before Nigro and his co-defendants stood trial.  The government's failure to produce this document, buried among 6,000 pages of 3500 material, until the eve of trial was a calculated means of insuring that its import would not come to light and would not be used to impeach Roche, ensuring Nigro's conviction.

B.    3500 Material Regarding John Bologna:

A good deal of cross-examination material is described in point II, below, the section addressing ineffective assistance of counsel for failing to cross-examine John Bologna under Rule 806 of the Federal Rules of Evidence (Fed.R.Evid. 806).  Much of that described therein is, in fact, *Brady*, material, including:

1.    Report 270A-NY-298B37, dated 10/22/2008:

In which Special Agent Joy Adam set forth that Bologna did not tell his original handling agent about (1) his criminal activities in Springfield, Massachusetts; or (2) that he was collecting money related to his criminal activities in Springfield; (3) that he lied when asked by his handling agent about the Bruno homicide and said

-25-

he did not know anything about it even though that was not accurate; (4) that he lied when telling his handling agent in 2004 that Bologna did not know whether Arillotta had been "made;" and MOST IMPORTANTLY, (5) Bologna told his handling agent that Scop (Pasquale DeLuca) was in charge of the Genovese Crime Family, whereas he was now contending that Nigro was in charge during 2003.  Bologna's excuse was that he "wanted to protect people including Artie Nigro." Exhibit E, 1st page.

In Government 3520-117, an FBI 302 dated September 30, 2013, Special Agent Bukowski wrote:

> The individual (Bologna) stated that the "Harlem" crew of the Genovese Family, **which is run by PATSY "SCOP" DELUCA**, asked JOHN BALOGNA (sic), an "Associate Member" of the Gambino Family from New York and an old friend of the HARLEM CREW's, to travel to the Springfield, Massachuset (sic) area.

Exhibit E, 5th page. This is the time period the government claimed Nigro was in charge, it is unquestionably *Brady* material.

THE MOTION TO CONTINUE

Two days after receiving this voluminous 3500 material, on February 11, 2011, the defense filed a motion to continue the trial for 90 days, contending it was impossible for counsel and the defendants to review the 20,000 pages of paper discovery and a thousand hours of audio recordings.  Attached to the motion was the

-26-

district court's order to show cause to the warden of MDC as to why he should not be held in contempt for not giving the defendants the required access to discovery. A.81. A.79.  The government filed a memorandum in opposition. A.90.

A contempt hearing was held on February 16, 2011. A.127. The warden was not present. The prosecutor and legal counsel for MDC conceded the defendants were not getting the required access. A.130-132. The district court continued the hearing so that the warden and other jail staff could explain themselves.

At the continued hearing the following day, the warden acknowledged that he and his staff had been complacent on the issue and that he was now fully awake. The district court would not grant a continuance or other relief. A.158-159.

At the motion hearing on February 22, 2011, the defense stated that although the court already ruled on the issue, it was submitting a letter explaining that the defendant was not prepared for trial. A.234-236

Trial proceeded as scheduled and the defendants were convicted.

THE APPEAL

In their direct appeal, the defendants argued that the District Court erred in denying their February 11, 2011 motion for a continuance.  Affirming defendants' convictions, the Second Circuit noted that the decision to grant a continuance is a traditionally within the discretion of the trial judge. *United States v. Arillotta*, 529 F.

App'x 81, 82 (2d Cir.)*, cert. denied sub nom. Geas v. United States*, 134 S. Ct. 666,

187 L. Ed. 2d 440 (2013) (*citing United States v. O'Connor*, 650 F.3d 839, 854 (2d

Cir.2011) (internal quotation marks omitted):

> Here, the record shows that, prior to denying the motion in question, the district court had previously granted a continuance, and that it had ordered the Metropolitan Detention Center, where Defendants were housed, to provide library time for them to review discovery. Furthermore, Fotios and Ty Geas have failed "to specify with any particularity how [they were] prejudiced by not receiving a ... continuance." *United States v. Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir.2007) Accordingly, we find that the district court did not abuse its discretion in denying the Geas's motion for a continuance.

What neither defense counsel, the defendants, the District Court nor the

Court of Appeals knew was that, contained within the 6,000 pages of additional

"3500" material was **substantial *Brady* material** which, had the defense been able

to discover and use in a timely manner, would have made the difference between

being convicted of the charges against them and their acquittal.  Because these

materials are not in the record, this matter can only be addressed through a Motion

to Vacate under 28 U.S.C. § 2255.

-28-

ARGUMENT

POINT ONE:

THE GOVERNMENT SUPPRESSED EXCULPATORY
INFORMATION IN VIOLATION OF THE DUE
PROCESS CLAUSE AND, <u>MANDATING NIGRO'S
PETITION BE GRANTED.</u>

The government has an affirmative duty to disclose favorable evidence

known to it, even if no specific disclosure request is made by the defense. *Brady v.*

*Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed.2d 2 (1963); *see also Kyles v.*

*Whitley,* 514 U.S. 419, 430, 115 S. Ct. 1555, 1565, 1567-68, 131 L. Ed.2d 490 (1995);

*United States v. Agurs,* 427 U.S. 97, 108-10, 96 S. Ct. 2392, 2399-2401, 49 L. Ed.2d

342 (1976). The individual prosecutor is presumed to have knowledge of all

information gathered in connection with the government's investigation. *See Kyles*

*v. Whitley,* 514 U.S. at 432, 115 S. Ct. at 1567 ("prosecutor has a duty to learn of any

favorable evidence known to the others acting on the government's behalf in the case,

including the police"). Where the government's suppression of evidence amounts to

a denial of due process, the prosecutor's good faith or lack of bad faith is irrelevant.

*See id.*; *Brady v. Maryland, supra,* 373 U.S. at 87, 83 S. Ct. at 1196-97.

Evidence is not considered to have been suppressed within the meaning

of *Brady* if the defendant or his attorney "'either knew, or should have known, of the

-29-

essential facts permitting him to take advantage of [that] evidence.'" *United States v. Zackson,* 6 F.3d 911, 918 (2d Cir.1993) (quoting *United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S. Ct. 823, 74 L. Ed.2d 1019 (1983)).  *See also United States v. Diaz,* 922 F.2d 998, 1007 (2d Cir.1990) (no *Brady* violation by non-disclosure of witness's testimony as to a fact within personal knowledge of defendant), *cert. denied,* 500 U.S. 925, 111 S. Ct. 2035, 114 L. Ed.2d 119 (1991); *United States v. Esposito,* 834 F.2d 272, 275 (2d Cir.1987) (no *Brady* violation where defendant had possession of transcripts containing the pertinent material). Documents that are part of public records are not deemed suppressed if defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation. *See, e.g., United States v. Bermudez,* 526 F.2d 89, 100 (2d Cir.1975) (state's investigative files were not suppressed since defense counsel, who represented one of the defendants in the state proceedings, could have discovered them "with the exercise of due diligence"), *cert. denied,* 425 U.S. 970, 96 S. Ct. 2166, 48 L. Ed.2d 793 (1976).

In reviewing a *Brady* violation, evidence is material if there is a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70, 129 S. Ct. 1769, 173 L. Ed.2d 701 (2009). A "reasonable probability" means that the

likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial." *Kyles v. Whitley*, *supra*, 514 U.S. at 434. Evidence impeaching an eyewitness's testimony may not be material if the State's other evidence is strong enough to sustain confidence in the verdict. *United States v. Agurs*, *supra*, 427 U.S. at 112-13, and n. 21.

Here, there was no evidence other than the testimony of very interested witnesses to identify Nigro as "the little guy," and this testimony was contradicted by the *Brady* material that was suppressed by the Government. The killer, Frankie Roche, made clear in his hidden *Brady* material that "The Little Guy" was Anthony Arillotta, not Arthur Nigro, the person who ordered the murder of Adolfo Bruno was John Bologna, not Arthur Nigro, and that the order to kill Bruno came from Port Chester (John Bologna), not "New York." (Arthur Nigro).

This suppressed evidence was not merely material. It would have decimated the Government's case against Arthur Nigro. Had this evidence been revealed in a timely manner, defense counsel could have used it, incorporated it into the defense case, and obtained an acquittal. In light of the fact that no physical evidence connected Nigro to the murder, which is driving his sentence, proof that the order to kill Bruno came from Bologna and not Nigro cannot be minimized. This evidence would have resulted in his acquittal.

-31-

Moreover, as set forth in Section II, below, the failure to utilize this "3500" material to cross examine Bologna under Rule 806, if not the product of a *Brady* violation, constituted ineffective assistance of counsel.

POINT TWO:

TO THE EXTENT IT WAS NOT CAUSED BY THE *BRADY* VIOLATION, ARTHUR NIGRO WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO THE EFFECT ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO IMPEACH JOHN BOLOGNA AND OTHER WITNESSES UNDER FED.R.EVID. 806.

Arthur Nigro contends that his counsel's failings, described below, were engendered by the late-release of *Brady* material. To the extent that they were not, or the evidence was 3500 material and not *Brady*, counsel's act of declining failing to cross-examine John Bologna under Federal Rule of Evidence 806, as though Bologna was actually on the witness stand, constituted ineffective assistance of counsel. All of this could have been brought out through Special Agent Joy Adam, who testified for the government, or through Special Agent Robert Bukowski, who was Bologna's "handler" for more than ten years.

John Bologna should have been "cross-examined" under Rule 806 of the Federal Rules of Evidence, as though he was actually on the witness stand, with regard to the fact that he never identified Nigro as the acting head of the Genovese

Crime Family.   Instead, he consistently stated Pasquale "Scop" DeLuca was in charge, including on September 30, 2003, the very time period during which Nigro was supposed to have been in charge and ordering the murder of Adolfo Bruno. He should also have been cross examined with regard to his lies, and continued criminal activity – including involvement in murder and other acts of violence.

<u>THE RELEVANT FACTS</u>

a.      <u>Hearsay Testimony</u>.

Throughout the trial of this action, evidence against Arthur Nigro came largely through the testimony of cooperating witnesses who quoted John Bologna as having brought instructions from Nigro, among other matters.

With regard to the Weissman's testimony about hearsay statements concerning murder of Adolfo Bruno, the government argued:

> Honig: First of all, we've already briefed the issue of Mr.
> Bologna. He was clearly acting outside of the scope of any
> agreement he had with the government. The argument that
> the statement is convoluted or third hand, that's a fine. That
> goes to weight. That's fair game for a jury to address but it
> doesn't affect admissibility.

(Tr. 386) The Trial Court ruled that Weissman could testify to Santoro's out-of-court statements that Bologna said certain things about the death of Bruno, as they were in the course and furtherance of the conspiracy.  Thus, Weissman testified:

> Clem ran into Arty and John and he was produced to a guy
> Anthony. And then John Bologna said to Clem on the side,
> he says, that's the guy that Bruno, and he made a motion
> with a gun, I mean that Arty sent to Bruno.

(Tr. 376)

Arillotta also connected Nigro to the Bruno murder through Bologna's out-of-court statements. He claimed Felix Tranghese called Bologna from a pay phone and told Bologna that Bruno was a "rat." It was decided to bring the paper, Fusco's Presentence Report, to Nigro. (Tr. 637-38) Arillotta claimed that, in 2003, he discussed the plan to murder Bruno with John Bologna. He knew the circumstances of Bruno being marked for death the actual planning being done in Springfield. (Tr.1105) Most testimony connecting Nigro to this murder was hearsay, double hearsay, or even triple hearsay, originating with Bologna.

The conspiracy to murder and attempted murder of Dadabo was also connected to Nigro largely through out of court statements from Bologna as testified to by third parties. Arillotta told the agents that he asked Bologna what exactly it was that Arthur wanted him to do. Bologna went to Nigro and spoke with him. He returned and told Arillotta that Nigro wanted him to kill Dadabo. (Tr. 918)

Arillotta, however, acknowledged that the order from Nigro was to "give the guy a beating." It was Bologna who relayed the message to kill him. (Tr. 920)

-34-

Arillotta did not hear Nigro tell Bologna that Dadabo should be killed.  (Tr. 924-25)

Anthony Arillotta also testified to messages supposedly from Nigro, as related by Bologna with regard to the operations in Springfield, Massachusetts.. Arillotta set forth that Bologna began traveling to Springfield from New York, with instructions for Bruno "from Artie and Pat (DeLuca)"until late summer or early fall 2002. (Tr. 503) He testified that Bologna brought a message from Nigro to Jimmy Santaniello that his monthly payments had to increase. (Tr. 509)

Regarding the vending machines, Arillotta testified that he was in contact with John Bologna, who said he would be meeting with Nigro about taking over the vending machines.  Bologna would then return to Arillotta and pass along what he claimed were Nigro's instructions. (Tr. 733)

Arillotta testified that Bologna called him and said he just left Artie and to go ahead and do whatever you want to do with the Santaniellos, to "go into the business, take whatever you want, make any kind of deal that you want, and don't worry about Felix, or nothing else." (Tr. 734-35)

Money was given to Bologna, allegedly to be delivered to Nigro.  (Tr. 762) Arillotta set forth that he waited to get a message back from Nigro through John Bologna. (Tr. 799) With regard to the gambling machines, Arillotta was in contact with Bologna and Bologna (supposedly) was in contact with Nigro.  Bologna,

supposedly, would meet with Artie and get back to him with instructions. (Tr. 801)

Felix Tranghese's testimony against Nigro also was largely based on John Bologna's out-of-court statements.  He testified that Bologna claimed his orders came from Nigro; (Tr. 1555-56) that orders came from Nigro through Bologna to put Arillotta in charge of more stuff in Springfield; that Bologna gave the orders to push Bruno to the side. (Tr. 1560-61) Tranghese also testified that Bologna told him he was being pushed aside in Springfield and "you know where the order came from." He took that to mean Nigro. (Tr. 1605-06)  Although Bologna told him the money he collected was going to Nigro, he personally never gave Artie anything. He gave the money to Bologna. (Tr. 1637; 1654)

A.    <u>The Need to Impeach Bologna</u>:

With Bologna the absent crux of the Government's case against Nigro, it was imperative that he be impeached.  Starting with his utter failure to abide by the terms of his cooperation, and the fact that his crimes did not result in him being "booted" as an informant.  They resulted in him being signed up again.  Even where he signed his acknowledgment of his obligations as an informant, Bologna did not abide by the terms of his agreement as a Confidential Human Source (CHS).

In the reports of interviews with Bologna by his handler, F.B.I. Special Agent Robert L. Bukowski, Bologna, over a ten year period, never mentions Nigro

-36-

with respect to the gambling machines, the murder of Al Bruno, the construction

industry, or any other matter to which he testifies at trial.  This, alone, is critical cross.

He does not mention Nigro having any leadership role until 2005, when he already

was motivated by revenge.

B.     The FBI Reports of a "Confidential Human Source."

In a Routine FBI report dated May 7, 1997, it is set forth that the

"source" (Bologna) was advised of his obligations and role, including that his

assistance is voluntary and will not exempt him from prosecution for crimes not

approved of in advance by the FBI, that Bologna could not participate in acts of

violence, initial a plan to commit criminal acts, or participate in criminal activities

except under the auspices of the FBI. The May 7, 1997, report concludes that NK

12444 acknowledged that he fully understood the above.  A report dated July 8, 1997,

specifically acknowledges that NK 12444 is John Charles Bologna, a/k/a "JB."  All

yearly admonishments and Routine Reports are annexed as Exhibit F.

In Routine Report dated February 26, 1998, entitled,"Required

Admonishments to Criminal Informants, it is against set forth Bologna must report

all information both positive and negative, that he will not participate in acts of

violence and, if asked to participate in act of violence, or if he learns of plans to

commit an act of violence, Bologna will take all reasonable measures to discourage

the violence and report it to his handler as soon as possible.

On September 23, 1999, and October 23, 2000, the same "Required Admonishments to Criminal Informants/Cooperative Witnesses" was given to Bologna.  On June 13, 2002, the Admonishments were again given, this time with Bologna signing under his code name, "Squall." Exhibit F,  page 13.

Bologna's May 1, 2003, at"Yearly CI/CW Suitability Report and Recommendation" set forth once again that "NK 12444" (Bologna) acknowledged that he fully understood that he could not participate in acts of violence, could initiate criminal activity or participate in criminal activities except under the auspices of the FBI.   Exhibit F, pp. 18-19.

A February 13, 2004, form contains "Squall's" signature, acknowledging he could be prosecuted for any unauthorized criminal activity.  Exhibit F, page 21.

Clearly Bologna did not follow the directives and admonishments set forth above.  His crime spree continued unabated and he planned and orchestrated the murder of Adolfo Bruno.

In an intake form dated May 4, 2005, the Agent sets forth that Bologna was not an Confidential Informant or Cooperating Witness in the past.  (Exhibit F, page 24)  Significantly, his motive for cooperating is described as "revenge and his willingness to help the FBI." (Exhibit F, page 25). Certainly the fact that Bologna was

-38-

motivated by revenge when he began naming Nigro should have been before the jury. To the extent the failure to utilize this evidence was not engendered by the late release of *Brady/Giglio* material, it constitutes ineffective assistance of counsel.

That same day, Bologna formally signed a cooperation agreement under his code name, Squall, with his signature witnessed by Special Agent Robert Bukowski, his handler, and Timothy Buckley. (Exhibit F, page 27)

That Bologna was seeking revenge when he agreed to become an informant is critical. So is the fact that, before he became motivated by revenge, Bologna never mentioned Nigro. This critical cross-examination was ignored, either because counsel was ineffective, or because this *Giglio* material was not turned over to the defense in a timely manner, and identified as such.

C.      Reports on the Hierarchy of the Genovese Crime Family.

Although he described the hierarchies of the Gambino, Genovese and Gambino crime families throughout his cooperation, Bologna never mentioned Nigro in relation to his being "in charge" until 2005.

The first debriefing report pertaining to John Bologna in current counsel's possession is dated August 5, 1996. Bologna cooperated fully for 11 years, naming the heads of all of the organized crime families in New York, including the Genovese Crime Family, of which Nigro was supposed to have been in charge for

several months during 2002 and 2003.  Nigro's leadership is never mentioned at the time it supposedly occurred, while Bologna was giving accurate information on the leadership and operations of the Genovese and Gambino crime families.  Information accurate enough to earn him another shot at cooperation.

In twenty-two Reports from Special Agent Robert L. Bukowski, Bologna's handler, in counsel's possession, dated between November 17, 2006, and March 15, 2006, Bologna told his handler about the hierarchies of the so-called Gambino, Bonanno, and Genovese Crime Families, yet had only one reference to Nigro. (Exhibit G)

In a report dated November 25, 2002, Bologna states that Patty Deluca is traveling to Massachusetts to see Bruno, and make five new members, over the weekend.  DeLuca was in charge at that point.  Exhibit G, 6th page.

A report dated December 28, 2002, states, "The individual added that PATTY DeLUCA has been knocked down from his position."[11] At no time, however, does Bologna state that Nigro has taken over for him.

In Government 3520-117, an FBI 302 dated September 30, 2003, Special

---

[11]      That report also states, "... the Family has a new way to get rid of people they do not want around any more.  They promote them, believing they will draw attention to themselves by law enforcement, making them targets.  This is easier than 'whacking them.'  Law enforcement does their dirty work for them."

Agent Bukowski wrote:

> The individual (Bologna) stated that the "Harlem" crew of
> the Genovese Family, **which is run by PATSY "SCOP"**
> **DELUCA**, asked JOHN BALOGNA (sic), an "Associate
> Member" of the Gambino Family from New York and an
> old friend of the HARLEM CREW's, to travel to the
> Springfield, Massachuset (sic) area.

Exhibit G, 10th page. This is the time period the government claimed Nigro was in

charge.

The debriefing of January 27, 2005, states, "INDIVIDUAL advised that

ARTIE (ARTHUR NIGRO) was "left in charge" when Ernest Muscarella was sent

to prison.  (Exhibit G, 19th page) Muscarella, however, was not "sent to prison" until

he self-surrendered to begin serving a 60 month sentence on September 8, 2003.

(Exhibit H at p.5, docket entry 131)

Moreover, despite numerous debriefings between 2003 and 2005,

Bologna never before mentioned Arthur Nigro.  Significantly, as noted above in

Bologna's next intake statement, three months later, Special Agent Bukowski noted

that Bologna's motive for cooperating was "revenge," and a desire to help the FBI.

In a report dated February 18, 2004, Bologna claims that "FELIX

TRANGHESE is the acting boss, but PATSY "SCOP"  DELUCA is in charge

In Report 270A-NY-298B37, dated October 22, 2008, Special Agent

-41-

Adam noted that Bologna told Special Agent Bukowski that Scop (Pasquale DeLuca) was in charge of the Genovese Crime Family throughout the time period, and never told Bukowski that Nigro was the "boss."

Not once during those first 11 years did he claim that Arthur Nigro was the acting head of the Genovese family. In fact, during her testimony, Agent Adam admitted that over 100 reports had been generated by interviews of Bologna. Nigro's alleged role was never mentioned.[12]

It is also important to note that not one report mentions Nigro in relation to the murder of Adolfo Bruno under after 2007, when Bologna received his second chance at cooperating, and was seeking revenge. Yet, defense counsel did not bring this out to the jury. Instead, the defense waived the right to impeach Bologna under Rule 806. This cannot possibly have been part of a valid trial strategy. It was either the result of the failure to turn over exculpatory material in a timely manner, in violation of *Brady*, or the product of ineffective assistance of counsel, in violation of *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984).

---

[12]    Similarly, in 11 reports between May 27, 1997, and July 20, 2003, concerning the construction unions and industry in New York, Bologna fails to mention Nigro even once. (Exhibit I)

D.   <u>Colloquy</u>.

Despite the fact that it was both fertile cross-examination, and the only way to impeach all of the hearsay from Bologna, Attorney Lawrence Hochheiser agreed not to bring out Bologna's prior cooperation. (Tr. 1663) The Government argued that the information was too confusing under Rule 403.

> MR. LANPHER: Your Honor, just so that the Court is aware of the history of this, Mr. Bologna was a confidential informant with the FBI beginning in around 1997 until around 2007. During that period <u>he was providing information</u> to an FBI agent based out of Newark. That information was about *selective individuals*, <u>not including the defendants here</u>. Mr. Bologna was <u>not debriefed</u> during that period. He was never signed up formally with a prosecutor's office. *<u>He continued to commit a rash of crimes without telling the FBI</u>*. ***He did not tell the FBI during that period, for example, his relationship with Arthur Nigro, his activities in Springfield, Massachusetts***.
>
> In 2007, Bologna was approached by Special Agent Adam who was investigating the Bruno homicide, among other crimes. She approached Bologna, told him she was investigating and planned to arrest him soon and requested his cooperation. He thought about it and then agreed. And then from that period forward from September 2007 forward he began being debriefed by the government and wearing a recording cooperating with the government for a long time. But which "A" was hearsay, .. it was never, there was never a time period ever put on it. And in any event, we don't see the relevance of the pre-2007 informant relationship which we are concerned will unnecessarily confuse the jury and divert the trial into a sideshow.

-43-

THE COURT: All right. Two observations and they are, I suppose, observations that pull in opposite directions. Observation number one, we have a transcript of the extensive discourse by Mr. Hochheiser yesterday and I am not proposing to pull out the transcript right now but I believe it will speak for itself. And I believe Mr. Hochheiser manifested an understanding in the course of his remarks yesterday that the government would elicit that Bologna was a cooperator since 2007 at the time he represented to the Court, that he would not inquire prior to 2007. I didn't strong-arm anybody into this device for certain recordings. He recorded consensual conversations with various people. So we were planning to elicit from special agent Adam when she began cooperating with John Bologna, the fact of that cooperation to admit a recording that he made in October 2008.

We had spoke when defense counsel last week about his anticipated cross-examination of Special Agent Adam and Mr. Hochheiser agreed that he had no intention of getting into the prior to 2007 informant relationship as it frankly to us and our understanding was to him as well it was not relevant and was frankly quite confusing here. For him to suggest that that's now in the record based on Mr. Tranghese's comments we disagreed with entirely. Mr. Tranghese was asked on cross-examination having learned this John Bologna was cooperating.

(Tr. 1734)

MR. LANPHER: I think you can bring jury in. We are going to elicit on direct through a witness that prior to 2007 that John Bologna had a relationship with the FBI as a confidential informant. I think. that is the cleanest way to resolve all of this.

(Tr. 1743)

-44-

Assuming the reports described above were provided to defense counsel in a timely manner, defense counsel's waiving of the right to cross-examine Bologna under Rule 806 constituted ineffective assistance of counsel..

E.     <u>Discussion</u>.

Rule 806 of the Federal Rules of Evidence states:

> When a hearsay statement –  or a statement described in Rule 801(d)(2)(C), (D), or (E) – has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness. The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it. If the party against whom the statement was admitted calls the declarant as a witness, the party may examine the declarant on the statement as if on cross-examination.

Fed. R. Evid. 806.

1.     <u>John Bologna Should Have Been Cross-Examined With Regard to His Inconsistent Statements</u>.

While an in-court declarant can only be examined as to a prior inconsistent statement, the out-of-court declarant's inconsistent statement may have occurred after the hearsay related in court.  With an actual witness the inconsistent statement will of necessity be a prior statement.   In the case of hearsay the inconsistent statement may well be a subsequent one.

-45-

In *United States v. Uvino*, 590 F. Supp.2d 372 (E.D.N.Y. 2008), the government presented a tape taken from a recorder worn by a confidential informant during the alleged assault, on which the alleged assault victims' voices could be heard. The district court learned the alleged victims of the assault would invoke their Fifth Amendment right against self-incrimination. As a result, the alleged assault victim's statement, contained in FBI agent's report, admitting that he had faked a seizure during the course of the assault, was admissible under rule of evidence governing attacks on the credibility of a hearsay declarant. The declarant's statement to the FBI agent was inconsistent with his hearsay exclamations heard on the tape. He, and his declaration, were therefore allowed to be impeached with a subsequent inconsistent statement: his admission that he faked the seizure heard on the tape. 590 F. Supp.2d at 380.

Similarly, in *United States v. Traska*, 962 F. Supp. 336 (E.D.N.Y. 1995), the defendant did not testify, but his son testified that in his conversation with defendant, defendant transferred possession of firearms his son. The Defendant's prior statement that he had narcotic-like addiction to firearms was not directly inconsistent, but its admissibility did not turn on whether it directly contradicted the declaration testified to by the Defendant's son. It was enough that hearsay statement afforded some indication that fact was different from son's testimony, even though

-46-

the statement was the fruit of an illegal search.  *United States v. Traska*, *supra*, 962 F. Supp. at 338.

Similarly, in *United States v. Wuagneux*, 683 F.2d 1343 (11th Cir.), *cert. denied,* 464 U.S. 814, 104 S. Ct. 69, 78 L. Ed.2d 83 (1982) the Eleventh Circuit held that Agent's testimony as to the prior inconsistent statements of an out-of-court declarant, was admissible to impeach the out-of-court declarant's credibility.

Here, the F.B.I.'s reports reflect statements that are completely inconsistent with what witnesses claimed John Bologna had told them, either directly or through omission.  Defense counsel's failure to impeach the out-of-court declarant with those prior inconsistent statements rendered his performance ineffective, depriving Arthur Nigro of his constitutional right to the effective assistance of counsel.

2. Counsel Should Have Examined the Agent About Bologna's Criminal Behavior and Continued Crimes While Acting as an Informant.

As set forth above, an out-of-court declarant may be cross-examined under Rule 806 as though he was actually on the witness stand.  In the case at bar, defense counsel rendered ineffective assistance when he waived the right to impeach the chief witness against his client, violating Arthur Nigro's rights under the Sixth Amendment to the United States Constitution.  U.S. Const. Amend. 6.

-47-

In *United States v. Burton*, 937 F.2d 324 (7th Cir. 1991), the Seventh Circuit held that the trial court had abused its discretion in disallowing cross-examination of FBI agent regarding a non-testifying government informant's prior criminal convictions for impeachment purposes.  In that case, the informant's out-of-court declarations were heard on tapes during the trial, and no limiting instruction was given.  937 F.2d at 327.

For defense counsel to permit the Government to state that Bologna had been a government informant for 11 years, and then was re-signed by the Government, without delving into his repeated lies to the Government and his failure to abide by his obligation under his agreements with the government, his participation in extortion, loan sharking and murder, actually bolstered his credibility.  Suddenly, the hearsay elicited through co-conspirators was not merely the out-of-court testimony of another co-conspirator, but the word of a person acting on behalf of the government.  And that person was not impeached with 11 years worth inconsistent statements, lies, and violence in contravention of his agreement with the government – for which he was awarded another agreement and a 5K letter.  This was fruitful cross-examination that could have severely impeached the alleged out-of-court declarations.  Instead, the jury was given more rather than few reasons to believe the declarations attributed to John Bologna: he was working for the Government.

-48-

As testified to by Special Agent Joy Adam, Bologna cooperated with the FBI's Newark Field Office from 1996. (Tr. 1748)  Between 1997 and 2007 over 100 reports were generated from Bologna's meetings with the FBI. (Tr. 1787) Yet, Defense counsel declined the opportunity to inform the jury that Bologna never named Nigro as the "boss," contrary to the statements attributed to him by the in-court witnesses.  Nigro, moreover, was never mentioned in reference to the Bruno murder, loan sharking, extortion, the construction industry, or anything else.  In fact, Bologna was nearly silent as to even the existence of Arthur Nigro.  This was substantial cross-examination that should not have been waived.  Assuming defense counsel was given timely access to the impeachment materials, the failure to utilize them rendered counsels' assistance constitutionally ineffective, and violated Nigro's constitutional right to the effective assistance of counsel.

Bologna was a cooperator who committed numerous crimes, and authorized murders, while cooperating with the government.  He lied to all sides: the people he was spying on and the people for whom he was spying.  He made decisions and passed the blame along so as to continue committing crimes with impunity. Defense counsel's decision to waive this vital cross, to the extent it was not engendered by a *Brady* violation, constituted ineffective assistance of counsel.

-49-

3.     Counsel Was Ineffective For Failing to Utilize Rule 806 With Regard to James Santaniello.

James Santaniello was also an out-of-court declarant who had cooperated with the Government.  Santaniello was an extortion victim who became government informant on October 9, 2002.  This was during the time period that Nigro was supposed to have been running Massachusetts operations from New York.  It was also just prior to the period during which the government contends Nigro was the acting head of the Genovese Crime Family.

The handwritten notes of Santaniello's first debriefing by the Government are extensive, comprising 21 pages of detail concerning the extortion of clubs and sports gambling in the Springfield, Massachusetts, are.  See Exhibit J.  They contain a single reference to Arthur Nigro, a notation on the 17th page that Nigro, Bruno and Pat (Pasquale DeLuca) were at Caramia's on Columbus.

According to the subsequently issued report of the Massachusetts State Police, at his initial meeting on October 9, 2002, Santaniello was given the CI number 02-0034-5.  He discussed in depth the extortion of nightclubs in the Springfield, Massachusetts, area.  He named the following persons:  Anthony Arillotta, Joseph Basile, John Bologna, Adolfo Bruno, Victor Bruno, Nicola Caputo, David Cecchetelli, Pasquale DeLuca, Jeffrey Kuselias, Anthony Liquori , Louie Santos,

Theodore Sares, Felix Tranghese and Natalino Zamboni.  All of the players named throughout Nigro's trial, except Arthur Nigro. (The Massachusetts State Police Reports are attached as Exhibit K).  See Exhibit K at pp. 1-2.

At his next meeting, May 17, 2004, Santaniello again discussed extortion in the Springfield and again named Arillotta, Bologna and Tranghese, but also added Leo Bono, Michael Cimmino, Anthony DeLevo, Carol DeLevo, Mario Fiore, Fotios Geas, Jr., Tyler Geas, Carlo Mastrotataro, Frank Pugliano, Timothy Sampson, and Albert Scibelli.  Again, he made no mention of Arthur Nigro.  Exhibit K, p.3.

His next meeting, on March 16, 2005, related to Santaniello's monthly payments to Anthony Arillotta.  He named Arillotta, Daniel Kelly and Pugliano.  On July 13, 2006, Santaniello discussed organized crime in the Springfield area.  He named Basile, Reno Ceraolo, Emilio Fusco, Rafael Silva and Jacob Znoj.  On August 31, 2006, the intelligence report from the interview concerning organized crime in the Springfield area named Arthur Abrams, Daniel Black, Anthony and Carol DeLevo, Gary DeSimone, Fusco, Fotios Geas, Jr., William Geas, Liquori, Pugliano and Tranghese.  His September 22, 2006, interview named Arthur Abrams, Gary DeSimone, Fusco, Sares and Tranghese.  There is still no mention of Arthur Nigro.

Additional debriefing reports dated October 25, 2006, May 18, 2007, March 14, 2008, June 16, 2008, July 14, 2008, August 21, 2008, January 16 2009 and

June 24, 2009, named all the same players in different combinations with two exceptions. Joseph Zullo was referenced in the March 14, 2008, report; Richard Valentini was named in the June 24, 2009, report. There was not a single mention of Nigro in any of Santaniello's debriefing reports provided to counsel herein.

Counsel's failure to cross-examine Santaniello under Rule 806, utilizing these reports, or to call Santaniello as a witness constituted ineffective assistance of counsel. Santaniello wasn't just a government informant. As law enforcement was well-aware – at least in Massachusetts – Santaniello was Bologna's victim. He had nothing to say about Arthur Nigro.

F.     The Standards for Ineffective Assistance of Counsel.

To the extent any *Brady* material was not suppressed, Nigro was deprived of his right to effective assistance of counsel when his trial counsel failed to make use of the evidence that the witnesses against him had previously made statements about the same events in which they did not inculpate Mr. Nigro.

To prevail on a claim that he was deprived of his right to the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution to the ineffective assistance of trial counsel, Nigro must establish both that the performance of his trial counsel was constitutionally deficient, and that this deficient performance prejudiced his defense *Strickland v. Washington*, 466 U.S. 668,

-52-

687, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984). U.S. Const. Amend.6.  As set forth above, counsel's failure to utilize Rule 806 to impeach John Bologna constituted constitutionally deficient representation.

To establish prejudice, Nigro "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington, supra*, 466 U.S. at 694, 104 S. Ct. 2052. Once such a showing is made, the claim is not defeated by a showing that counsel provided competent representation in a more general sense. *Henry v. Poole*, 409 F.3d 48, 72 (2d Cir.2005) (state court unreasonably applied *Strickland* when it ignored the probable impact of counsel's unprofessional errors, relying instead on finding that counsel provided meaningful representation overall).

A court reviewing an ineffective assistance of counsel claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Espinal v. Bennett*, 588 F. Supp. 2d 388, 398 (E.D.N.Y. 2008), *aff'd*, 342 F. App'x 711 (2d Cir. 2009) (*citing Strickland v. Washington, supra*, 466 U.S. at 690, 104 S. Ct. 2052; *Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir.2007); *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994)).  *See also Eze v. Sekowski*, 321 F.3d 1000 (2d Cir. 2003); *Pave v. Hollins*, 261 F.3d 210 (2d Cir.

2001); *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001).

    1.    <u>Defense Counsels' Failure to Utilize *Brady* Material Fell Below an</u>
<u>Objective Standard of Reasonableness, Rendering Their Performance</u>
<u>Ineffective</u>.

        In *Espinal v. Bennett, supra*, Petitioner claimed his trial counsel

provided ineffective counsel by failing to investigate and discover the witness who

appeared in a redacted DD-5 report dated June 22, 1989. The United States District

Court for the Eastern District of New York held that defense counsel's decision to

forego an alibi defense might have seemed a reasonable trial strategy in light of his

failed efforts to investigate his client's claims and his reasonable conclusion that the

only known alibi witness would be a liability to Espinal's case.  588 F. Supp.2d at

400.[13]

        The District Court held that, nevertheless, an existing trial strategy, even

if *initially* reasonable, cannot excuse counsel's failure to investigate new evidence that

---

    [13]    This DD-5 recounted a police interview with a witness whose name
was redacted in the defense's copy, which was provided to petitioner before trial.
It corroborated Espinal's alibi, as it supported his claim that he was driving his car
when he encountered his brother after his brother had shot the victims, and was
not with his brother at the time of the shootings.  588 F. Supp.2d at 399. Defense
counsel also testified that he had most likely received these reports after he had
spoken with the only potential alibi witness available to him. H. Tr. at 187-88.19
Counsel either did not recognize the redacted report as important evidence for
Espinal's alibi claims, because he had apparently already decided to forego an
alibi defense by the time he received them.  588 F. Supp.2d at 399.

could potentially exonerate his client or create reasonable doubt in the minds of the jury.  In the absence of any alibi witnesses, counsel's trial strategy was to poke holes in the prosecution's case, in order to create doubt in the jury's mind about his client's guilt. This strategy was largely successful at Espinal's first trial, at which ten jurors were reportedly prepared to acquit based on their doubts about the credibility of the prosecution's case. 588 F. Supp.2d at 401.

This error rendered trial counsel's otherwise vigorous defense of his client ineffective.  His failure to investigate potentially exculpatory evidence, in the absence of a reasonable explanation, was held to fall below the constitutional standard of effective representation required by *Strickland*.  588 F. Supp.2d 401 (*citing Lindstadt v. Keane*, *supra*, 239 F.3d at 200 ( counsel ineffective where failure to investigate available evidence "prevented [petitioner] from offering something akin to an alibi")); *Schulz v. Marshall*, 528 F. Supp.2d 77, 96 (E.D.N.Y. 2007) (counsel "breached his duty to investigate [petitioner's] case diligently"); *Sparman v. Edwards*, 26 F. Supp.2d 450, 452-53 (E.D.N.Y.1997) (counsel ineffective for failing to investigate evidence). Counsel could not recall the DD5, and could offer no excuse for failing to investigate it.  Espinal was thus found to have shown that trial counsel failed to investigate whether the redacted police report and other disclosed materials could have supported his alibi claims. In the absence of a reasonable explanation,

-55-

counsel's failure to investigate these police reports cannot be presumed to be sound trial strategy. Accordingly, Espinal was held to have satisfied the first prong of the *Strickland* test.

Here, Nigro received otherwise vigorous representation from his defense team.   Assuming this Court finds the government did not suppress the evidence, however, counsel's failure to utilize *Brady* material that would have severely undermined the government's case and the credibility of its witnesses, especially John Bologna, rendered counsels' performance ineffective under *Strickland*.

While Attorney Hochheiser asked Mr. Roche on cross-examination if by New York he meant Port Chester, he did not utilize Exhibit C, the report dated April 16, 2007, in which Roche clearly stated that Fred Geas had told him the order to kill Bruno had come from Bologna in Port Chester.  Clarifying that "New York" meant "Port Chester" was simply insufficient.

   2.   <u>Trial Counsel's Failure to Investigate and Use the *Brady* Evidence and 3500 Material Prejudiced Nigro Sufficiently to Meet the Second Prong of *Strickland*</u>.

Under Strickland, counsel's errors alone are insufficient to warrant relief. The Petitioner must also prove that "counsel's errors prejudiced the defendant to the extent that they 'undermine confidence in the outcome'" of his trial. *Espinal v. Bennett*, *supra*, 588 F. Supp.2d at 401-02 (*citing Lindstadt v. Keane*, *supra*, 239 F.3d

at 204; *Strickland v. Washington*, *supra*,, 466 U.S. at 694, 104 S. Ct. 2052).

A Petitioner claiming ineffective assistance of trial counsel must show more than that the unprofessional performance merely "had some conceivable effect." To satisfy the 'reasonable probability' test, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Henry v. Poole*, *supra*, 409 F.3d at 63 (*quoting Strickland v. Washington*, *supra*, 466 U.S. at 693, 104 S. Ct. 2052 (emphasis in Second Circuit's opinion)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992)

In *Mak v. Blodgett*, 970 F.2d 614 (9th Cir. 1992), the Ninth Circuit upheld the District Court's grant of relief on *Strickland* grounds in a death penalty case, finding counsel's errors could have affected the conclusions of at least one juror, and all jurors are required to concur in order to return a death verdict. "All it would have taken is for 'one juror [to] have struck a different balance' between the competing stories." *Wiggins v. Smith*, 539 U.S. 510, 537, 123 S. Ct. 2527, 156 L. Ed.2d 471 (2003).

In *Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007), the Sixth Circuit held:

[T]he central teaching of *Strickland*, as reaffirmed by

> *Wiggins*, 539 U.S. at 522-23, 123 S. Ct. 2527, [is] that the investigation leading to the choice of a so-called trial strategy must itself have been reasonably conducted lest the "strategic" choice erected upon it rest on a rotten foundation.

490 F.3d at 488. *See also Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).

Thus, a purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.

Like the petitioner in *Espinal v. Bennett, supra*, Nigro was convicted largely on the strength of two witnesses. Assuming that the prosecution witnesses told the truth, this evidence is more than sufficient to support a guilty verdict. Evaluating the strength of the prosecution's case, however, it must be noted that the ignored exculpatory material would have substantially undermined the credibility of the government's case and its witnesses. Had it bee utilized at trial by the defense, this evidence would have resulted in Arthur Nigro's acquittal.

3. The Failure to Impeach Arillotta and Tranghese on the Alleged Presentence Report Rendered Counsel's Assistance Ineffective.

Defense counsel failed to counter the testimony of Arillotta and Tranghese about the Fusco presentence report, which Arillotta and Tranghese both testified was brought to John Bologna in the Spring of 2003. This constituted

-58-

ineffective assistance of counsel.[14] (Tr. 1568) Tranghese testified that, in the Spring of 2003 Nigro discussed Fusco's PSR, stating Tranghese "was going to have to sit down with somebody else, other people and explain that paper to 'em." (Tr. 1568)

In the docket sheet for Fusco's case, however, *United States v. Scibelli*, 00 Cr. 30036 (MAP), makes very clear that the presentence report could not have been seen in the Spring of 2003. See Exhibit L.

At page 30 of Exhibit L, docket entry 446, dated June 23, 2003, the government requested an extension of time until July 11, 2003, to provide the Probation Department with a Statement of Facts relevant to the Presentence Reports:

> MOTION to ext. time to 7/11/2003 to provide the Probation Department with a global statement of relevant facts and other docs. as to Albert Scibelli, Emilio Fusco, Todd Illingsworth, Andrew Scibelli, Anthony J. Delevo, Vincent Canavan, Franco Decaro, Anthony Grasso, Antonio Esposito, Michael Tancrati, Robert Gossman by USA filed. (Finn, Mary) (Entered: 06/24/2003)

The Motion was granted the following day, June 24, 2003. See Exhibit L. Accordingly, the "Fusco PSR" could not have been brought by Tranghese to Nigro in the Spring of 2003.

---

[14] By contrast, the government led Roche into setting forth a time frame that it preferred, asking if he saw the "piece of paper" in the summer or fall of 2003. (TT1306) No objection to the leading was made.

More to the point, United States Probation Officer Richard Rinaldi, from the District of Massachusetts, Springfield Vicinage, testified that he conducted the presentence investigation and prepared the Presentence Report (PSR) for Emilio Fusco. According to Rinaldi, based on the objections of defense counsel that Emilio Fusco was not a member of organized crime, he reached out to the prosecutor with regard to that objection. As a result, paragraph 101 was added to the final report. That paragraph stated:

> Special Agent Hedges would testify that on February 12, 2001, Al Bruno confirmed that Fusco had been quote, made, end quote, while Bruno was in jail.

(Tr. 1125) According to Rinaldi, that Presentence Report was issued on September 9, 2003, (Tr. 1126) long after the Spring of 2003.

Yet, at no point did defense counsel point out to the jury the impossibility of this PSR having been seen by these witnesses in the Spring of 2003. It was not produced until September 9, 2003. There was not even a draft of the PSR until the summer, which did not contain the language cited by the witnesses. The Government's summation lulled the jury into believing that the witnesses had claimed to have seen this paper in September. They had not.

> And then the final straw. Emilio Fusco's presentence report that you've seen so many times. This paper hit the streets in September of 2003. You know that it spread like

-60-

> wild fire. Arillotta saw it. Felix Tranghese saw it. Frankie Roche saw it. Got passed around cause this was a huge deal.  You had it in writing, a court document, that Al Bruno, a made guy, had spoken with the FBI and broken that code of silence and that is the number one sin for the mob. That is the number one threat to the mob.

(TT1909 15-23)

> It was mentioned again in the government's rebuttal:

> And on top of that you have a PSR, that presentence, that court document that went down, passed around the whole Genovese family. Roche saw it. Arillotta saw it. Tranghese saw it. You heard all about how that led to the murder of Al Bruno.

(TT2052 24-25 to 2053 1-2)

Defense counsel failed to take the simple step of setting forth through the government's own witness and the docket sheet evidence that witnesses that Arillotta's and Tranghese's claims that seeing the "paper" in the Spring of 2003 was not only wrong, but provides grounds to argue that the witnesses "compared notes" before testifying, resulting in both making the same mistake as to when this alleged incident occurred. Had they been telling the truth, they might have remembered the truth.  Had they not compared notes, they would probably not have made the same mistake.

4.     <u>Defense Counsels' Failure to Obtain Nigro's Medical Records for 2002 to 2003 Rendered Their Performance Ineffective</u>.

It was the Government's position that Nigro was the "acting head" of the so-called Genovese Crime Family of the La Costa Nostra (LCN) in 2002 to 2003.  It was also the Government's contention that Nigro was actively involved in various criminal activities, and held numerous meetings in Manhattan, during that period.

As noted in the Affidavit of Arthur Nigro (Exhibit M), Nigro informed his attorneys that he had been very ill during most of 2002 and 2003, having suffered a heart attack. He was in no position to attend meetings or run any business, let alone a crime family.  He asked that his attorneys contact his physician, Thomas Apuzzo, M.D., in order to show that he was too ill to have played the roll attributed to him by the Government.

In response to this request, rather than obtain the records and testimony of Dr. Apuzzo, defense counsel chose to cross-examine witnesses with regard to their personal knowledge Nigro's health.  This was ineffectiveness.

Weissman had testified that Nigro was elevated to acting head of the Genovese Crime family in 2002 or 2003. (Tr. 426) Rather than bringing in medical records, Counsel asked Weissman if he knew whether Nigro was hospitalized in 2002 due to a heart attack, and due to kidney stones in 2003. (Tr. 399)

-62-

Likewise, Arillotta had testified that Nigro went to Springfield, Massachusetts, in 2001 and 2002, (Tr. 515) and that he continued meeting with Nigro after the fall of 2002. (Tr. 539) Evidence of Nigro's heart attack and its aftermath would have proved Arillotta and Weissman were liars.[15]

In his Affirmation dated June 19, 2015, Thomas Apuzzo, M.D., declared under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.  I am a medical doctor, with offices located at 955 Yonkers Avenue, Lower Level, Yonkers, New York 10704.

2.  I have been Arthur Nigro's physician since approximately July of 1999.

3.  This Affidavit is based upon my review of my notes and the notes Mark Greenberg, M.D., Mr. Nigro's cardiologist and others at :Montefiore Medical Center in The Bronx, as well as the notes of Dr. Briberg at St Joseph's Hospital in Yonkers, New York, which are contained in my patient files.

4.  In May of 2002, Mr. Nigro suffered a heart attack,. and was confined to Joseph's Hospital in Yonkers, New York, until June 9, 2012 .

5.  On June 9, 2012, Mr. Nigro transferred to Montefiore Medical Center, where stents were surgically inserted into his heart.

6.  I saw Mr. Nigro at Montefiore Medical Center on June 18, 2002.

---

[15]   Counsel also asked Felix Tranghese is asked if he knew Nigro had had a heart attack in June of 2002. (Tr.1651)

7.   He was discharged later that day, placed on a smorgasbord of medications and total bed rest.

8.   Mr. Nigro was seen in my office on July 23, 2002, and continued to be kept at home with instructions to continue with no work and no stress.

9.   Mr. Nigro's situation was not yet sufficiently stable, and he was not yet strong enough, to begin cardiac rehabilitation, which normally would have been started in August.

10.  Mr. Nigro was seen in my office again on September 3, 2002, and was directed to continue staying at home and to refrain from working.

11.  When he was seen by his cardiologist in October of 2002, Mr. Nigro passed his stress test and was permitted to begin cardiac rehabilitation.

12.  When Mr. Nigro was seen in March of 2003, he was suffering from bloody noses and left arm pain from bicycling exercises. He was still in cardiac rehabilitation but was strong enough to be allowed to begin normal activities.

13.  When I saw Mr. Nigro in October of 2003, his blood work was good and he had no significant symptoms at that time. My notes do not state whether he was still exercising or in rehabilitation, but he was still seeing his cardiologist.

14.  In September of 2004, Mr. Nigro was no longer exercising or engaging in cardiac rehabilitation. He had inflammation in his foot from Plantar Fasciatus.

15.  In March and April of 2005, Mr, Nigro had an upper respiration infection, or a bronchitis, which lasted for approximately one month.

-64-

16.   In July of 2005, Mr. Nigro spent five to ten days at Montefiore Medical Center due to kidney stones.

17.   Mr. Nigro had another kidney stone approximately one month later, for which he went to Saint Joseph's Hospital in Yonkers twice over the next two months.

18.   In September of 2005, a urologist was monitoring Mr. Nigro.

19.   In December of 2005, Mr. Nigro had problems with exertional chest pains from exercise and saw Dr. Wechsler, a cardiologist whom Mr. Nigro claimed he was seeing regularly.

20.   Prior to this year, I was never contacted by any attorney acting on Mr. Nigro's behalf.

21 .   I am willing to testify as to Mr. Nigro's medical condition.

Exhibit N.

Certainly Dr. Apuzzo and his records would have been a far more effective means of demonstrating that Nigro's health was too poor in 2002 and 2003 for him to have run any business, let alone be "acting head" of a crime family.

It should be noted that not one witness ever testified to meeting Nigro at his home or his hospital, despite his hospitalization and total bed rest, during 2002. Meetings were in restaurants and a Laundromat, according to the witnesses, but no witness was aware that Nigro was on bed rest at home. Certainly this would have been substantial evidence in Nigro's defense.

-65-

5.   Defense Counsel Failed to Obtain The Docket of Nigro's Earlier Case to Refute Arillotta's Testimony.

Similarly, Arillotta testified that Fotios Geas advised that when he was released from prison in 2006, Fotios "started making contact with Artie in New York." (Tr. 768) Nigro, however, was arrested in February of 2006, charged with being a soldier in the Genovese Crime family, and placed on strict pretrial supervision.  He would not have been involved in criminality with Fotios Geas in 2006.  Yet, counsel did not take the simple step of proving Arillotta was lying about Geas' alleged statement through the docket sheet from Nigro's earlier case.  The docket sheet from Nigro's 2006 Indictment shows Nigro was arrested on February 15, 2006, and placed on strict pretrial supervision.  Exhibit O, docket no. 118.

6.   Defense Counsel Failed to Bring Out the Government's Prior Version of Nigro's Alleged Role in the Genovese Crime Family in Two Earlier Cases.

A.   The Title III Application Regarding John Ardito:

On December 6, 2010, Regina Nigro, Mr. Nigro's daughter, sent an e-mail to Attorney Murray Richman.  That letter, the fourth page of Exhibit P, states:

> From: Regina Nigro
> Date: Mon, Dec 6, 2010 at 9:40 AM
> Subject: Urgent -- Arthur Nigro
> To: mrichman_mr@msn.com
>
> Dear Mr. Richman.

I'm Regina, Arthur Nigro's daughter. During a recent search online, I found something that might pertain to my father's case. It's a transcript from a wiretapped conversation on or around August 2003 (three months before the murder of Adolfo Bruno in November 2003). In it, my father is mentioned only once but it's significant. In the transcript, which you'll find attached as a PDF file -- at the top of page 16 of the PDF file; it's technically page 44 of the transcript (and can be found online at: www.politechbot.com/docs/fbi.ardito.affidavit.p2.12010 6.pdf ), Peter Peluso is speaking to Ernest Muscarella. Quoting directly from the transcript, Peluso mentions that Mr. Muscarella "would be better off making Artie (believed to be Arthur Nigro, a Genovese LCN Family soldier) a captain." This suggests that, if the FBI was contending that the "Artie" mentioned here was my father, he was not only NOT acting boss in August 2003, he was at most a low-ranking "soldier" (which they never actually established in court, either). How could someone, within the span of three months, go from being a soldier to an acting boss ordering mob hits? The prosecution and their witnesses would need to explain such a meteoric rise to power.

Obviously I find this very upsetting. I'm afraid, very afraid if I'm being completely honest, that a credulous jury might overlook some of these inconsistencies and oddities, and make a choice that affects me and my family forever.  I'm sorry if this sounds overwrought or melodramatic, I'm just deeply disappointed in the turn this has taken.

Thank you for your help. If either of you need anything further from me, please don't hesitate to contact me at this email address (Redacted) or you can call me at [Redacted]

Sincerely,
Regina Nigro

-67-

Attached to Ms. Nigro's e-mail were pages 29 through 79 of the Government's September 3, 2003, in a Title III application related to a wiretap application related to the Genovese Crime Family. Those pages are attached as Exhibit Q.

The Title III Application noted that it was the latest in a series of Title III applications. Prior applications were dated December 31, 2002, January 31, 2003, March 3, 2003, April 2, 2003, May 16, 2003, and June 18, 2003. Like the September 3, 2003, all of the Affidavits in support of those Title III applications set forth various activities of the Genovese Family hierarchy, including meetings at restaurants.

According to the September 3, 2003, application, surveillance was conducted at the four previously targeted restaurants on June 18, 2003, June 19, 2003, June 20, 2003, June 21, 2003, June 23, 2003, June 26, 2003, June 27, 2003, June 30, 2003, July 1, 2003, July 3, 2003, July 16, 2003, July 22, 2003, August 4, 2003 and, August 20, 2003. On September 3, 2003, Nigro was an unknown soldier.

In those 14 taped meetings, the only reference to Nigro, whom the Government contended was then the acting head of the "family," came on the June 21, 2003. The September 3, 2003, Application stated at pages 43-44, paragraph 39:

> 39. PELUSO also said that he (MUSCARELLA) would be better off making "Artie" (believed to be ARTHUR NIGRO, a Genovese LCN Family soldier) a captain

-68-

(Capo). This is believed~to refer to the ongoing dispute involving ARDITO pertaining to the Genovese LCN Family's interests in Connecticut.

Exhibit Q, pp. 43-44.

Nigro was not mentioned again in the ten meetings that followed

Moreover, according to this Application, visual surveillance was conducted of various meetings. Those surveyed meetings occurred on July 18, 2002, August 12, 2002, August 13, 2002, August 27, 2002, September 9, 2002, September 26, 2003, October 22, 2002, October 28, 2002, October 30, 2002, November 15, 2002, November 24, 2002, November 26, 2002, November 19, 2002, January 6, 2003, January 22, 2003, January 31, 2003,  March 22, 2003, June 27, 2003, July 1, 2003, August 11, 2003, and August 25, 2003.  Nigro was not sighted at any of those 21 meetings.

Thus, in September of 2003, seven years into John Bologna's cooperation, at the time the government now contends Nigro was "in charge," after 14 taped meetings and 21 observed meetings over the course of 14 months, Nigro was believed to be a soldier.  This is a far cry from the allegation that he was the acting head of the crime family during that time.  And this is evidence that would have proved John Bologna's claims that Artie Nigro was in charge were simply false. Bologna was committing acts of extortion, blackmail, murder and attempted murder

-69-

while in service to the Government.

And this was while Bologna was actively informing for the Government. There can be no doubt the fruits of his cooperation were considered when the 2003 case was being made. Bologna was not unknown to the Government.  Nigro was.

Despite being informed of this information on December 6, 2010, defense counsel took no steps to utilize this information, nor did it seek copies of the earlier Title III applications under *Brady*.  The ones in defense counsel's possession, however, were solid evidence that should have been used to prove that the Government's case against Nigro – based solely on the testimony of three cooperators who mostly testified on the basis of hearsay from John Bologna – contradicted its own extensive investigations and Affidavits.

### B.   The Prior Indictment Against Arthur Nigro.

In 2006, with the benefit of countless hours of surveillance and wiretaps, and the long-term cooperation of John Bologna, the Government charged 32 members of the alleged Genovese Crime family in a 76 page, 42 count indictment, 06 Cr. 0008 (LAK) .  That Indictment charged crimes from Murder in Aid of Racketeering to gun possession.  Nigro was charged with three counts of Racketeering in violation of 18 U.S.C. § 1962(c) and (d), three counts of Interference with Commerce by Threats or Violence (Hobbs Act, 18 U.S.C. § 1951 and 2), three counts of interference with

-70-

Commerce by Threat or Violence, Conspiracy to Extort (18 U.S.C.§ 1951); three

counts of interference with Commerce by Threat or Violence, Attempt to Extort (18

U.S.C.§ 1951); one count of Extensions of Credit by Extortion, two more counts of

Interference with Commerce by Threat of Violence (Extortion Conspiracy); one count

of Extension of Credit by Financial Extortion, one more count of Interference with

Commerce by Threat or Violence (Attempted Extortion); three counts of Extensions

of Credit by Extortion and three counts of Collection of Credit by Extortion.

Charged along with Nigro were Liborio S. Bellomo, John Ardito, Ralph

Balsamo, Salvatore Larca, Gerald Fiorino, Vincent Russo, Albert Tranquillo, Jr.,

Louis Moscatiello, Pasquale DeLuca, Anthony Romanello, Albert Facciano, Pasquale

Sperduto, Angelo Aquillino, Tomas Terraciano, James Pisacano, Joseph Pisacano,

Walter Galiano, Claudio Caponigro, Anthony Negri, Sr., Albert Faella, Andrew Shea,

John Tomero, Joseph DeRosa, Joseph Lanza, Raymond Delarosa, Dominick Bruno,

Vincent Rendino, Eric Cmiel, Louis Grillo, Mark Fiore, and Samuel Lopez.

On page 12 paragraph 10 states:

k. Arthur Nigro, a/k/a "Artie," was, at various times
relevant to this Indictment, a Soldier and an Acting Capo
(Captain) in the Genovese Organized Crime Family.
Among Nigro's criminal activities was participation in an
extortion

Exhibit R at p.12.

-71-

Thus, apparently, the suggestion to promote Nigro to "capo," as overheard in the restaurant wiretaps, was carried out.  The times relevant to this Indictment were from at least in or about the early 1990s, up through and including in or about February 2006. (Exhibit R at paragraph 13, page 16).

Moreover, According to Mr. Nigro, the same allegation – that Nigro was a soldier in the so-called Genovese Crime Family – was contained in Nigro's Presentence Report, a copy of which we are attempting to obtain.

Nigro was sentenced to fifty-one (51) months incarceration on October 3, 2007.  At that time, Bologna had already started the second life of his cooperation despite his history of murders, violent crimes and lying to his handler.  And despite Bologna's cooperation, at the time the government now claims Nigro was the acting head of the Genovese Crime Family, he was considered a mere soldier.  Yet, none of this was brought to the jury's attention.

That the Government believed Nigro to be a mere soldier or acting capo in 2006 after a substantial investigation, during the height of Bologna's cooperation, is relevant evidence to impeach its current version of the events, which was premised largely on the facade created by John Bologna. By failing to bring this before the jury, trial counsel was ineffective.

-72-

POINT FOUR:

ARTHUR NIGRO JOINS IN THE MEMORANDUM OF
LAW FILED BY FOTIOS GEAS IN SUPPORT OF HIS
MOTION TO VACATE, WITH REGARD TO ALL
ISSUES IN COMMON.

CONCLUSION

No incriminating physical, videotaped, photographic, scientific, DNA, documentary or wiretap evidence (containing Nigro's voice), connected Nigro to the crimes of which he was convicted.  Nor were any recorded admissions by Nigro introduced.  Only the suspect testimonies of Roche, Tranghese and Arillotta evidenced alleged admissions or acts by Nigro.

The government's entire case against Nigro essentially boiled down to the testimony of those two witnesses, Tranghese and Arillotta,[16] both career criminals with great motive to falsely implicate Nigro: life sentences in federal prison. Roche's testimony did not implicate Nigro. In fact, with benefit of Roche's suppressed Brady material, Roche would have been the defense's star witness.

For all the reasons set forth above, it is respectfully moved that this Court grant Arthur Nigro's Motion to Vacate.

---

[16]     Mitchell Weissman was, at best, a fringe career criminal in Florida with no personal knowledge of Nigro.

Respectfully submitted,

ARTHUR NIGRO, by his attorney

Dated:  June 29, 2015

/s/ *Ruth M. Liebesman*
Ruth M. Liebesman (RL 5383)
30 Wall Street, 8th Floor
New York, New York 10005
212-804-5740
- - - - - - - - - - - - - - - - - - - - - -
36 Farview Terrace
Paramus, New Jersey 07652
201-617-7000
201-617-7710 (facsimile)
201-787-6002 (mobile)

## CERTIFICATE OF SERVICE

RUTH  M.  LIEBESMAN  an  attorney-at-law  duly  licensed  to  practice  law before this Court, hereby certifies that, on the date set forth below, she caused a copy of the foregoing to be served on all counsel by causing it to be filed electronically through the Court's ECF filing system

Dated: June 29, 2015

/s/ *Ruth M. Liebesman*
Ruth M. Liebesman (RL 5383)

-74-

EXHIBIT LIST

Exhibit A:   Government Letter dated December 10, 2010.
Exhibit B:   Frankie Roche Report of Investigation dated: 4/23/2007
Exhibit C:   Frankie Roche Report of Investigation dated 4/16/2007
Exhibit D:   Frankie Roche's Statement
Exhibit E:   Agent Adam's 302 that Bologna lied.
Exhibit F:   FBI yearly admonishments and routine reports
Exhibit G:   Bologna 302s on Who's in Charge
Exhibit H:   Muscarella Docket Sheet
Exhibit I:   302s re: Construction Unions
Exhibit J:   Santaniello proffer letter and handwritten debriefing notes.
Exhibit K:   Santaniello Debriefing Reports
Exhibit L:   Fusco Docket Sheet
Exhibit M:   Nigro Affidavit
Exhibit N:   Dr. Apuzzo's Affidavit
Exhibit O:   Docket Sheet, 2006 case
Exhibit P:   Affidavit of Regina Nigro
Exhibit Q:   Pages 29 through 59 of Title III Application.
Exhibit R:   2006 Indictment