(jj) On or about August 28, 2003, the Honorable Kenneth A. Marra, United States District Judge for the Southern District of Florida authorized the interception of wire communications of ALBERT FACCHIANO and others.

### G. **Factual Basis**

17. The facts comprising the basis for this affidavit are derived from the following sources:

(a) information provided by confidential sources to Special Agents of the FBI;

(b) testimony at federal racketeering trials involving members and associates of LCN;

(c) physical surveillance conducted by law enforcement officers, including me;

(d) independent investigation by law enforcement officers, including me; and

(e) interceptions of oral communications occurring within the FOUR RESTAURANTS pursuant to previous Court Orders.

18. Unless otherwise noted, whenever I set forth a statement by a confidential source, the source spoke either directly to me or to another law enforcement officer, who thereafter communicated such information to me. Unless otherwise noted, all statements set forth herein that are attributed to confidential sources or other witnesses are stated only in substance and in part. In addition, unless otherwise noted,

29

BUG001308

information set forth herein concerning physical surveillance is based on my own participation in the surveillance or was communicated to me by other FBI agents or other law enforcement officers who conducted such surveillance.  Because this affidavit is being submitted for the limited purpose of securing authorization for the interception of oral communications, I have not included each and every fact that I have learned during this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the order sought herein.

## II. **PROBABLE CAUSE**

### A.    Background

19.  As detailed below and more fully described in the December 31, 2002 Affidavit, the January 31, 2003 Affidavit, the March 3, 2003 Affidavit, the April 2, 2003 Affidavit, the May 16, 2003 Affidavit, and the June 18, 2003 Affidavit (collectively the "prior affidavits"),[9] there is probable cause to believe that the SUBJECTS and others as yet unknown are participating in the illegal activities of the racketeering enterprise, and the various racketeering offenses, described in paragraph 6, above. Pursuant to the December 31, 2002 Order, the January 31, 2003 Order, the March 3, 2003 Order, the April 2, 2003, the May 16,

---

[9]    The April 2, 2003 and June 18, 2003 Affidavits, as with the other prior affidavits, are fully incorporated herein by reference.

30

BUG001309

2003 Order, and the June 18, 2003 Order (collectively, the "prior orders"), authorization was received to intercept communications occurring within the FOUR RESTAURANTS -- BRUNELLO'S PREMISES, AGOSTINO'S PREMISES, MARIO'S PREMISES, and the MARINA PREMISES. As explained below (and in the prior affidavits), interceptions to date confirm that the SUBJECTS are using the FOUR RESTAURANTS to engage in racketeering activities, including extortionate control of retail and construction businesses, loansharking, and labor bribery. The SUBJECTS have now discovered the FBI's listening devices at two of these locations, and the other two listening devices were removed by the FBI to prevent their likely discovery. However, the TARGET SUBJECTS are continuing to meet at the FOUR RESTAURANTS and other locations that are impractical to specify to discuss the illegal activities of the racketeering enterprise. In addition, ARDITO has brought the ARDITO CELLPHONE to most of these meetings.

      20. To date, all of the goals of the prior orders have not yet been achieved. Because of this, as well as the SUBJECTS' discovery of the other listening devices, and the FBI's belief from surveillance, intercepted communications, and source information that ARDITO and the other SUBJECTS continue to discuss their participation in racketeering activities at other locations besides the FOUR RESTAURANTS, this application seeks authorization to intercept oral communications at locations used

31

BUG001310

by JOHN "BUSTER" ARDITO that are impractical to specify, through
a listening device placed in the ARDITO CELLPHONE, or other
means.

B.    **The SUBJECTS' Recent Activities Within the FOUR
RESTAURANTS**

21.   As explained above, the FBI intercepted oral
communications occurring variously within the FOUR RESTAURANTS --
BRUNELLO PREMISES, AGOSTINO'S PREMISES, MARIO'S PREMISES and the
MARINA PREMISES pursuant to prior orders.  The interceptions from
the prior orders, with the exception of the June 18, 2003 Order,
are described in the prior affidavits.  These interceptions,
along with the interceptions described below, demonstrate that
there is probable cause to believe that the TARGET SUBJECTS are
participating in the illegal activities of the racketeering
enterprise, and the various racketeering offenses, described in
paragraph 6, above.

22.   Because each of the conversations were quite long,
I have not included every pertinent discussion that occurred
during the intercepted conversations.  The following descriptions
of conversations are based upon my participation in the actual
monitoring of the conversations, as well as a review by myself
and fellow agents of the tapes of intercepted communications,
logs completed by the monitoring personnel, draft summaries and
partial transcripts of some of the conversations, as well as my
conversations with monitoring personnel.  Based on my training

32

BUG001311

and experience and my discussions with other law enforcement officers involved in this investigation, I have also included interpretations of certain terms, phrases and names in parentheses.

**Wednesday, June 18, 2003 (The BRUNELLO PREMISES)**

23. On Wednesday, June 18, 2003, at approximately 12:00 p.m., ARDITO met at the BRUNELLO PREMISES with DORIS. During the conversation, which lasted for approximately one hour and fifty minutes, ARDITO stated that he would not meet with Vinny (RUSSO) anymore on Friday's because "Vinny owes Manny money." "Manny" had apparently asked ARDITO to talk to RUSSO about paying the money. ARDITO was happy that "Manny" came to him (ARDITO) instead of going to someone else to complain about RUSSO. ARDITO mentioned that "they charge him a dime." ARDITO and DORIS then discussed Joe Nina (who owns a restaurant) and other people, and ARDITO's involvement with Nina. DORIS also mentioned "Macalla (ph.)" and ARDITO responded that he "got 15 years." In part, I believe that ARDITO is discussing his involvement in the collection of a loan made by "Manny" to RUSSO.

24. ARDITO talked extensively about his case (this likely refers to a prior criminal case involving ARDITO). ARDITO mentioned $1,000,000, and how PELUSO and another attorney worked for him on the case. Also during their discussion, ARDITO and DORIS talked about a "Dr. DiMateo" [Robert DiMateo]. (I am aware

33

that DiMateo was under investigation by the FBI for his
involvement in submitting false claims to the Social Security
Administration on behalf of Neil Parrello, brother of Pasquale
Parrello, a capo in the Genovese Family who is currently
incarcerated on racketeering charges.)

25. PELUSO then arrived. PELUSO said that "Dom"
(DOMINICK CIRILLO the former acting boss of the Genovese LCN
Family) said that "if that's what he wants to do, that's what
I'll do." The others at the table wanted PELUSO to explain "it"
to everybody. PELUSO responded, "Who's everybody?" PELUSO also
said that "he" is probably talking about "Larry" (DENTICO,
believed to be a member of the ruling panel controlling the
Genovese LCN Family). PELUSO later stated that he was going to
"see someone," and mentioned breaking someone's legs, that the
"guy made us look bad." ARDITO said that he warned "him" that if
"you don't bring the money, you are not going to get that machine
back." ARDITO also mentioned going to DiMateo. In this portion
of the conversation, in part, ARDITO, PELUSO and the other
SUBJECTS are discussing messages received from CIRILLO and
DENTICO relating to ARDITO's attempt to control the Genovese LCN
Family's interests in Connecticut.

26. Later in the conversation, the participants talked
about Neil and Patsy (Parrello, brothers who were both charged in
racketeering indictments filed in this District, along with other

34

members and associates of the Genovese LCN Family).  At another

point, they discussed "Salerno" (possibly Fat Tony Salerno, the

former boss of the Genovese LCN Family) and Frank Costello.

ARDITO said that "Frank" is "dead."

**Thursday, June 19, 2003 (MARIO'S PREMISES)**

      27.  On Thursday, June 19, 2003, at approximately 12:07

p.m., ARDITO and PELUSO met at MARIO'S PREMISES.  During the

conversation, which lasted for approximately two hours, PELUSO

mentions "Joey C.", and ARDITO stated that he was "getting 10%"

shaking everyone down.  ARDITO mentioned "Scooter" (ANTHONY

GUIDO) and PELUSO mentioned a "Stevie" and a "Joey Blue Eyes," as

well as another "kid."  PELUSO stated that "they killed him."

After they "killed," they gave information.  ARDITO and PELUSO

were talking softly at this point in the conversation, discussing

how "they" killed her husband.  DORIS, who had since arrived,

mentioned T.J. Gelardo (a soldier in the Luchese LCN Family)

being on a doctor's payroll (a possible no-show job).  ARDITO

also brought up "Dr. DiMateo," and that it had just "slipped his

mind" for a minute.  They discussed how Gelardo was on the

doctor's payroll, and ARDITO thought that it was a "shylock loan"

which a doctor had given to Gelardo to pay Gelardo back and to

write off the loan.  (In June 2003, Dr. Jude Barbera was

convicted in this District of various tax and fraud charges that

involved his relationship with Gelardo; ARDITO and PELUSO are

35

discussing how Gelardo was apparently employed by Barbera to pay back an extortionate loan that he received from Gelardo).

28. ARDITO, PELUSO, and DORIS then spoke of visiting prisons. PELUSO stated that where "Bobby" (Manna, a made member of the Genovese Family whom agents believe is a high-ranking soldier serving a prison sentence) is, there is no visiting on Wednesday. PELUSO said that next Wednesday, he and John Mitchell (lawyer for ERNEST MUSCARELLA) were going to go and visit Manna. PELUSO mentioned that "Ernie" (MUSCARELLA, a capo in the Genovese LCN Family who is on the administration panel that is now running the Genovese Family, and who recently pleaded guilty in two separate racketeering cases filed in the Eastern District of New York and in this District) and "Quiet Dom" (DOMINICK CIRILLO) "were consulted on this." MUSCARELLA reportedly stated that "he" (Manna) knows "where the money is." DORIS stated that "this is the innocent guy." Again, in this conversation, ARDITO, PELUSO and DORIS discussed a visit by PELUSO and another attorney to Bobby Manna, who is in prison, to discuss an issue with him. MUSCARELLA and CIRILLO had been consulted.

29. Towards the end of the conversation, ARDITO spoke on the ARDITO CELLPHONE with someone (possibly "Joey"), and with the owner of MARIO'S as well. The owner said "135,000 plus what he gave Vito (DiSalvo, a soldier in the Genovese LCN Family)." Based on my knowledge of the investigation, I believe that this

BUG001315

is referring to the fact that PALADINO received a loan from a friend of the owner of MARIO'S named "Joe" LNU. Vito DiSalvo, as the "godfather" of the loan, received approximately $10,000 of the loan proceeds. ARDITO said that PALADINO told ARDITO that PALADINO had also paid back "Vito's money." ARDITO stated that he would make an appointment with "him and PALADINO" face to face. The owner said that he did not think that "Joe" is lying. ARDITO said that "they robbed a lot of people" and that there are two Paladinos, and that one would get blamed for what the other would do. ARDITO also said that to give $250,000 "you're crazy" (referring to a loan). ARDITO also said that "Patsy" (Genovese LCN Family capo Patsy Parrello) was "beat" for $250,000. ARDITO further said that an "Albanian" (possibly ABISH LAJQI) was involved. ARDITO called "Vito" (DiSalvo) a "nickel and dime hustler."

30. ARDITO stated that "Pat" (Parrello) had some money that he wanted to bury (that is, illegitimate money that he wanted to put on the street through loansharking), and they wanted ARDITO involved, but ARDITO said "no." ARDITO also said that he spoke with "Riggi" (Patsy Parrello's wife) and told her not to go to PALADINO for money or she would go to jail (presumably, because ARDITO believed that PALADINO and DISALVO were cooperating). ARDITO said that he did not want to get involved with "Vito" because ARDITO's name "came up" regarding

37

BUG001316

money laundering, and because ARDITO "doesn't trust any of them."

30.     Also during this conversation, PELUSO mentioned
"Louie" (MOSCATIELLO) (a member of the Genovese LCN Family),[10]
and said that someone had lied three times in front of "Ernie's
son" (MUSCARELLA's son, possibly Biagio Nicchia, MUSCARELLA's
stepson, who has also been charged with MUSCARELLA and
MOSCATIELLO in the Local 14 indictment).  PELUSO stated that if ·
"Barney" (Bellomo, believed to be the former acting boss of the
Genovese LCN Family) was around, "what would have happened"
(implying that if Bellomo had been out of jail, there would have
been consequences for the person who lied).

**Friday, June 20, 2003 (AGOSTINO'S PREMISES)**

31.     On Friday, June 20, 2003, at approximately 11:54
a.m., ARDITO and RUSSO met at AGOSTINO'S PREMISES.  During the
conversation, which lasted for approximately two hours and five
minutes, ARDITO and RUSSO discussed the money that RUSSO owes to
"Manny."  ARDITO told RUSSO that "Manny" came to ARDITO about the
money.  ARDITO said that he was not taking "Manny's" calls.
RUSSO stated that he wanted to "commit himself to him," and RUSSO
said he used to give "Manny" $500 a month (presumably as part of
a plan to repay the loan to "Manny").  It appears from this

---

[10]     MOSCATIELLO was arrested on February 26, 2003, in
connection with an indictment charging MOSCATIELLO with
racketeering and related charges regarding the Genovese LCN
Family's extortionate control of Local 14 of the International
Union of Operating Engineers.

BUG001317

interception, as also discussed above that "Manny" went to ARDITO for assistance in collecting on the loan "Manny" made to RUSSO.

32.   Later in the conversation, ARDITO said that he would "know today." ARDITO also mentioned an agent (of the FBI) who had come down to visit someone, as well as "Dr. DiMateo" (Robert DiMateo, who as previously mentioned, is under investigation for filing false paperwork).

33.   The conversation returned to the money that RUSSO owed to "Manny," and RUSSO acknowledged that he had been paying "Manny" slowly. RUSSO and ARDITO also discussed union laborers and "stamps" (benefit stamps for union employees). RUSSO asked if PELUSO had gone to see "Mario" (MARIO GIGANTE, a soldier in the Genovese LCN Family, and brother of Vincent "the Chin" Gigante, the boss of the Genovese LCN Family) and ARDITO stated that "Ernie" (MUSCARELLA) wanted to get a message. ARDITO referred to a "swap," and RUSSO mentioned "Gambino." (Apparently, RUSSO, who is currently associated with the Gambino LCN Family, wants to leave the Gambino Family and become associated with ARDITO and the Genovese LCN Family through a personnel swap). ARDITO also stated that he had to speak to Tony Migano (ph.) (believed to be Anthony Megale, a Gambino LCN Family capo). ARDITO also described speaking "to the big guy" and referred to "Ernie" and what "Ernie" wants (MUSCARELLA). ARDITO also spoke about "wrapping the whole thing up" and how they had been

39

BUG001318

described as "has-beens." I believe this to be a reference to the continuing dispute within the Genovese LCN Family between ARDITO over the Family's interests in the Connecticut.

34. Later in the conversation, PELUSO arrived. PELUSO stated that he was going to see "Barry" (Manna) the following week. PELUSO also said that his sister (Manna's sister) had called. PELUSO also said that "that guy" was delivering a "bad message" (possibly referring to a message from MUSCARELLA). ARDITO described what MUSCARELLA said through "Blaise" (Biagio Nicchia, MUSCARELLA's stepson). PELUSO said that he and "Blaise" had been together, and there was no communication and that "he is not getting the right message." PELUSO mentioned "Quiet Dom" (DOMINICK CIRILLO, the former acting boss of the Genovese LCN Family). PELUSO related his conversation with MUSCARELLA. ARDITO responded that he "doesn't understand Quiet Dom." PELUSO replied that "he and Larry" (DENTICO) were always close. PELUSO said that he wanted to tell "he [CIRILLO] and Larry [DENTICO] this is what he wants, what can I do." Again, this is believed to refer to communications from MUSCARELLA and others that pertain to the ongoing dispute regarding the Genovese LCN Family's interests in Connecticut. PELUSO is apparently complaining that Nicchia is giving ARDITO an incorrect message from MUSCARELLA, and PELUSO related what he believes MUSCARELLA really said since PELUSO was also at the meeting. PELUSO is also

40

complaining about problems with the avenues of communication between the leaders of the Genovese Family, many of whom have been indicted and have limited contact with other members of the Family, and those who carry the messages on their behalf, such as Nicchia and PELUSO.

35. At another point in the conversation, ARDITO stated that "he" (MUSCARELLA) knows that there "is a rat among us." ARDITO believed that the rat is with "Scop" (Pasquale Deluca, a member of the Genovese LCN Family with interests in Connecticut). PELUSO stated that "we got to get proof to point" the finger (referring to the "rat" or cooperating witness). PELUSO also stated that this person "ratted" on good guys.

36. Towards the end of the conversation, PELUSO spoke about going to "Barney" (Bellomo) for help. ARDITO said that "he needs two good guys," presumably for his crew. PELUSO said that "Sallie" (SALVATORE LARCA) is a good guy, and asked about "Hippy" (MICHAEL "HIPPY" ZANFARDINO). Later, ARDITO mentioned "Vinny Ocean" (a former high-ranking member of the Decavalcante LCN Family and a current cooperating witness). PELUSO and ARDITO further discussed whether there was a "boss of bosses." ARDITO mentioned "Joe Bonnano."

**Saturday, June 21, 2003 (the AGOSTINO'S PREMISES)**

37. On Saturday, June 21, 2003, at approximately 12:45 p.m., ARDITO and KATHY IVELLI (believed to be ARDITO's

41

girlfriend, who is frequently present for discussions involving organized crime) met at the AGOSTINO'S PREMISES. PELUSO later arrived.  The conversation continued for over three hours. ARDITO told IVELLI that agents from the FBI had visited "Tomas" and had asked him how much he paid to "Riggi," Patsy Parrello's wife.  ARDITO also stated that "Tomas" (TOMAS TERRACIANO) had been asked whether "you and 'Duke' [SONNY MARKS] cashed checks for doctors."  Later, ARDITO stated that there was going to be another "pinch" (series of arrests), and noted that agents had asked if ARDITO had taken over for "Patsy" (Parrello).

38.  At a later point in the conversation, the parties discussed a check cashing place and Roger Bombace (an associate of the Genovese LCN Family who recently pleaded guilty to racketeering charges in this District).  ARDITO indicated that he had thrown Bombace out of Patsy's Riggoletto restaurant (Parrello's restaurant).  They also discussed bugs at a table in Patsy's Riggoletto.  ARDITO speculated that "Roger" (Bombace, whom they believe is cooperating with the Government) had told the Government that ARDITO had taken over for "Patsy" (Parrello). PELUSO and ARDITO described how "Tomas" (TERRACIANO) and "Duke" (MARKS) get percentages from the check cashing scheme.  ARDITO later noted that "Tomas and Duke are shitting in their pants" (presumably because of their concern that Bombace is cooperating, and would reveal the existence of their check cashing scheme).

42

They continued to speculate during the conversation; at one point, PELUSO stated that "Roger" (Bombace) must have "opened his hands" and must have said that "Tomas" (TERRACIANO) was "Patsy's" (Parrello's) partner. ARDITO was apparently speculating as to whether "Tomas" cashed checks himself, and PELUSO said that if "Tomas" had sent "Roger" to cash checks, then the "Feds know."

       39.  Still later in the conversation, PELUSO stated that "Ernie" (MUSCARELLA) had said that he needed to send two more notes and that this is the "chance he has to take." PELUSO also said that "Ernie" (MUSCARELLA) and "Louie" (MOSCATIELLO) send the problems to "Larry" (DENTICO). ARDITO said that "Larry's" time will come. PELUSO said that they must be saying that they "misunderstood the message" (from MUSCARELLA). PELUSO also speculated that "Larry" (DENTICO) must have thought MUSCARELLA was "going to do 15 years" (on his two pending cases). At a further point in the conversation, ARDITO told PELUSO that he had sent a message back to "Ernie" (MUSCARELLA). PELUSO then recounted a conversation with other high-ranking members of the Genovese LCN Family. PELUSO said that "Louie" (MOSCATIELLO) had said that it's 99% certain. "Ernie" (MUSCARELLA) had said that "He's a captain and he's not being taken down." MOSCATIELLO, in turn, had said that "he" (MUSCARELLA) is going to have a tough time telling "Larry" (DENTICO). According to PELUSO, "Ernie" (MUSCARELLA) replied, "Who the hell is Larry?" PELUSO then told

BUG001322

"Ernie" (MUSCARELLA) that "Scop" Deluca was lucky.  MUSCARELLA
replied, "he's just acting, he's not made yet."  PELUSO also said
that he (MUSCARELLA) would be better off making "Artie" (believed
to be ARTHUR NIGRO, a Genovese LCN Family soldier) a captain
(Capo).  This is believed to refer to the ongoing dispute
involving ARDITO pertaining to the Genovese LCN Family's
interests in Connecticut.

40.   PELUSO and ARDITO also discussed "bookmakers" who
were splitting with a restaurant.  ARDITO mentioned that "Ernie"
(MUSCARELLA) was going to a meeting when he got "pinched."
ARDITO also mentioned "Fritzy" (Giovannelli, a capo in the
Genovese LCN Family who is under indictment in this District for
racketeering charges including obstruction of justice).  PELUSO
and ARDITO returned again to discussing "Tomas" (TERRACIANO) and
"Duke" (MARKS).  They discussed how the FBI had purportedly
visited "Tomas" again and how "Duke" was upset.  ARDITO said that
there was going to be another "pinch" (series of arrests by law
enforcement).  PELUSO told ARDITO that he had told "Tomas" that
"if you lie, it's a crime, so it's better to say nothin'."
PELUSO also speculated that "Roger" (Bombace) could have said
that ARDITO was "Patsy's boss."  PELUSO stated that the FBI will
"lean on Duke" because the FBI can break him (that is, PELUSO is
expressing his belief that the FBI will be able to pressure MARKS
into cooperating with its investigation).

44

**Monday, June 23, 2003 (the BRUNELLO PREMISES)**

      41.  On Monday, June 23, 2003, at approximately 11:56 a.m., ARDITO, DORIS, and JOHN PISTONE ("the Plumber") met at the BRUNELLO PREMISES and spoke for over two hours.  During the conversation, ARDITO advised DORIS that agents of the FBI had visited "Tomas" (TERRACIANO) at his house.  ARDITO said that the agents had told "Tomas" that ARDITO had taken over for "Pat" (Parrello), and discussed the doctors upstairs from Rigoletto's and "Duke" (SONNY MARKS).  ARDITO stated that "the check cashing guy, Dominick (Colosuono)" had told the truth.  ARDITO speculated that it was Roger (Bombace) who had told the FBI about this (that is, revealed the existence of the check cashing scheme in which TERRACIANO and MARKS were involved).  DORIS reminded ARDITO that ARDITO had warned the doctors to pay the taxes on the money.  They also discussed whether Rigoletto's was "wired" with a listening device.  ARDITO mentioned that he was "taking care of Pat's business."  ARDITO also stated that "Tomas" was in fact involved in a check cashing "scam."  ARDITO said that "Tomas" was "sneaking a piece of that" and that "Tommy" (Franco) and "Nicky" (Devito) were also involved.  ARDITO thought that they might "get another pinch" (get arrested for that).

      42.  DORIS then asked about the "stuff" (cases of wine) that were down in the basement.  ARDITO said that the agents did not ask about that.  (This is an apparent reference to wine

45

provided to Gino Ottomanelli, a cooperating witness, who in turn provided it to Patsy Parrello and later "Tomas," which ARDITO and "Tomas" believe was stolen property). DORIS mentioned tax evasion "unless the doctors say that they were being pressured to pay 15 percent (u/i)." DORIS stated that "Tomas" was the "weakest link," meaning the individual most likely to cooperate with the FBI's investigation.

43.    ARDITO then mentioned that PELUSO had gone to see "Bobby Manna" (a high-ranking member in the Genovese LCN Family) in the "pen" (prison). ARDITO also stated that "they know all about Buster taking care of it. They know all about that. (UI) I'm gonna go" (referring to his belief that he was going to be arrested shortly).

44.    The participants then discussed money owed by PALADINO to Joe LNU (the same individual on the phone with ARDITO and the owner of Mario's the prior week). ARDITO reported that PALADINO said that he only owed the "guy" a few dollars. ARDITO said that PALADINO "even paid him for the godfather" (referring to the payment made to Vito DiSalvo for arranging the loan). ARDITO said that they were "going to make a shylock out of him."

45.    Later in the conversation, ARDITO said that someone had said to him "I know about you being the boss of Connecticut," but that ARDITO did not "know what the guy was talking about." ARDITO said that he "knocked him off the $200 a

46

BUG001325

month payroll." ARDITO then told a story about a police

lieutenant's son who recognized "the kid." The son had

purportedly disappeared. ARDITO thought that the agents are

working on finding the son. ARDITO said that he suspected that

"the stool pigeon and his father were in on this." (This likely

relates to ARDITO's belief that the FBI is investigating the

disappearance of Steve Aiello, the son of a civilian employee of

the NYPD who ran the NYPD's Bureau of Criminal Investigation.

Aiello disappeared after he testified as an alibi witness for the

defense that resulted in the acquittal of Victor Mirdita, an

Albanian who had been charged with murdering the son of Pasquale

Parrello in an apparent dispute between members of the Genovese

and Gambino LCN Families.)

   46. ARDITO also complained that "they've been saying

we're has-beens. A couple of them come out, I'll show them what

kind of has-beens we are." ARDITO again stated that he thought

that "Tomas" would be arrested in three weeks and that "they"

(the Government) had "Roger" (Bombace, meaning that he was

cooperating with the FBI). DORIS said that "Roger" was charged

with "a gun." Still later, ARDITO noted that "he has an

appointment with the judge anytime [he] wants to go eat with

him." ARDITO said that he "did Pat a favor once, and the next

day he came back for another one." ARDITO again returned to

speculating about the next "pinch" and said he thought he was not

47

BUG001326

on "any tapes." He also described "Durso" (Michael Durso, a cooperating witness) as "a piece of shit compared to the guy from Jersey who cooperated from Sam the Plumber's crew." (Sam "the Plumber" Decavalcante was the boss of the LCN Family that bears his name.) ARDITO described what happened in 1974, when "they opened it up and made everybody."

**Thursday, June 26, 2003 (the BRUNELLO PREMISES)**

47. On Thursday, June 26, 2003, at approximately 12:56 p.m., DORIS and PELUSO met at the BRUNELLO PREMISES and spoke for over two hours. ARDITO arrived late. During the conversation, DORIS and PELUSO initially discussed "Tomas" and what he had told the "Feds" regarding "Riggi" -- Pasquale Parrello's wife. DORIS mentioned an "audit" and "IRS." PELUSO said that the FBI was "taking pictures." PELUSO stated that ARDITO needed to "put Megale in his place" (Anthony Megale, a Gambino LCN Family capo based in Connecticut). PELUSO also said that "Scop" (Deluca) must have told "him."

48. The conversation turned to George Barone (a former member of the Genovese LCN Family and current Government cooperating witness) and "flipping." ARDITO also mentioned "Ernie" (MUSCARELLA) and ARDITO sounded upset. ARDITO said that "George" was still in Florida. ARDITO explained his conversation with "Quiet Dom" (CIRILLO), but it was inaudible. ARDITO mentioned "stool pigeons" (cooperating witnesses). PELUSO

48

BUG001327

mentioned "Vinny Gorgeous" (Basciano, a made member of the Bonnano LCN Crime Family). Later in their conversation, they discussed "Ernie's" statements and his cases (MUSCARELLA's two cases, one in this District, and the other in the Eastern District of New York). DORIS discussed his plea.

**Friday, June 27, 2003 (the AGOSTINO'S PREMISES)**

49. On Friday, June 27, 2003, at approximately 11:55 a.m., ARDITO and PELUSO were intercepted at the AGOSTINO'S PREMISES. The conversation was almost entirely inaudible due to interference from other conversations.

**Monday, June 30, 2003 (The BRUNELLO PREMISES)**

50. On Monday, June 30, 2003, at approximately 12:00 p.m., ARDITO, PELUSO and DORIS met at the BRUNELLO PREMISES. During the conversation, which lasted for approximately two hours, PELUSO said that Ralphie Coppola (a soldier in the Genovese LCN Family who is believed to have been killed in the late 1990s) should have had his cousin watching his back (protecting him). ARDITO also talked about "Roger" (Bombace, who, as described earlier, is an associate of the Genovese LCN Family who recently pleaded guilty to racketeering charges in this District) "turning," (cooperating) and PELUSO responded, "Why else would they go to Tomas (TERRACIANO)?" In this conversation, ARDITO and PELUSO were discussing their belief that Bombace was cooperating with the Government and providing

49

incriminating information about Tomas.   Other FBI agents did in fact interview Tomas around this time.

### Tuesday, July 1, 2003 (the MARINA PREMISES)

51.   On Tuesday, July 1, 2003, at approximately 12:02 p.m., ARDITO and DORIS met at the MARINA PREMISES.   PELUSO arrived later during the conversation.   During the conversation, which lasted for approximately two hours, DORIS said that FBI agents went to see Colosuono (the owner of Prima Check Cashing, headquartered in Westchester, New York) at least three times. Later, PELUSO said, "We asked him about other check cashing places."   DORIS mentioned Tomas (TERRACIANO) and Duke (SONNY MARKS).   PELUSO then talked about aiding and abetting a conspiracy to defraud an insurance company, and said that "we" don't care how much of a percentage "they" were getting.   PELUSO also commented, "Don't you think they know about the Javits Center."   In this conversation, among other things, PELUSO was talking again about a health insurance fraud and check cashing scheme involving TERRACIANO, SONNY MARKS and Dominick Colosuono.

### Thursday, July 3, 2003 (The MARINA PREMISES)

52.   On Thursday, July 3, 2003, at approximately 11:59 a.m., ARDITO and DORIS met at the MARINA PREMISES.   PELUSO also joined the meeting and participated in the conversation.   During the conversation, which lasted for over two hours, ARDITO said that "Anthony" (Mangone, Patsy Parrello's lawyer) was still

50

BUG001329

bringing messages back and forth (from Parrello, who is in prison, to other members and associates of the Genovese LCN Family). ARDITO also said that a "pinch" (arrest) was coming down in the next week, and PELUSO said that they (the FBI) might be "working finer points." Also during the conversation, PELUSO mentioned Tomas (TERRACIANO) and "Pat" (Pasquale Parrello, a capo in the Genovese LCN Family) and then said that if "Roger" (Bombace) gave them more, they (the Government) can get TERRACIANO to "flip" (cooperate). PELUSO also commented that Roger knew about "bookmaking, he made pickups" and he knows about "the checks." ARDITO responded that Tomas (TERRACIANO) "doesn't know nothing." ARDITO also said that "the $250,000 thing is not over with." In this conversation, the SUBJECTS were again discussing the types of incriminating information Bombace could give to the Government if he cooperated.

C.   **The SUBJECTS' Discovery Of The Listening Devices**

53.   On or about July 9, 2003, the SUBJECTS discovered the listening devices at the AGOSTINO'S PREMISES and the MARINA PREMISES. Specifically, on July 9, 2003, ARDITO met with two unidentified individuals, as well as PALADINO and others. During the meeting, I overheard ARDITO and the others manipulating the tape that was wrapped around the listening device, which had been installed underneath the table at which the SUBJECTS were meeting. This indicated to me that they had discovered the

51

BUG001330

listening device, and that it was no longer underneath the table.

54.   Thereafter, ARDITO and the other SUBJECTS were observed leaving AGOSTINO'S and traveling to the MARINA PREMISES. At the MARINA, after a brief conversation, I overheard a sound that appeared to be someone feeling for a listening device underneath the table.  I heard the individual who was conducting the search bump against the listening device, which was also under the table at the MARINA PREMISES.  The individual left that device underneath the table, but the SUBJECTS, including ARDITO, left the table.

55.  As a result of the discovery of these two listening devices, agents removed the devices.  Agents also removed the listening devices at the BRUNELLO PREMISES and the MARIO'S PREMISES before they could be detected.

56.  Following the discovery of these listening devices, the FBI has learned, from source information and from surveillance, that the SUBJECTS have returned to the restaurants for meetings, but are careful to check for listening devices. For example, several of the SUBJECTS have been observed meeting at several of the FOUR restaurants on the following occasions:

(a)   July 16, 2003:  ARDITO, DORIS, and PELUSO were observed meeting at the MARINA PREMISES with an unidentified individual at approximately 1:15 p.m.  At 2:18 p.m., PELUSO left the PREMISES, and at 2:49 p.m., ARDITO and DORIS left the

52

PREMISES.

   (b) <u>July 22, 2003:</u> At approximately 12:53 p.m.,
ARDITO and DORIS were observed meeting at the AGOSTINO'S
PREMISES.

   (c) <u>August 4, 2003:</u> At approximately 11:49 a.m.,
ARDITO and DORIS were observed meeting at the BRUNELLO PREMISES.
PELUSO later arrived before 12:37 p.m., and ARDITO, DORIS, and
PELUSO met until 2:45 p.m.

   (d) <u>August 20, 2003:</u> At 11:45 a.m., ARDITO
arrived at the AGOSTINO'S PREMISES.  At approximately 11:50 a.m.,
a car arrived, and ARDITO met with two unknown males.  These two
individuals left at approximately 12:26 p.m.  Thereafter, at
approximately 12:39 p.m., JOHN ALBANESE (believed to be a member
of ARDITO's crew who lives in Florida) arrived.  PELUSO arrived
at approximately 1:36 p.m., and they met until approximately 3:30
p.m.

  **D.** **<u>ARDITO and the Other SUBJECTS Regularly Meet At</u>**
    **<u>Locations That Are Impractical To Specify To Further</u>**
    **<u>The Goals Of The Racketeering Enterprise</u>**

   57. As explained in the Prior Affidavits and above,
the TARGET SUBJECTS, including ARDITO, and other members and
associates of LCN, regularly meet at the FOUR RESTAURANTS --
BRUNELLO PREMISES, AGOSTINO'S PREMISES, the MARIO'S PREMISES, and
the MARINA PREMISES to discuss, among other things:  (i) the
operation and leadership structure of the Genovese LCN Family;

53

BUG001332

and (ii) criminal activities – such as loansharking, gambling, extortion and control of labor organizations – of the SUBJECTS and other members and associates of the Genovese LCN Family. However, based on physical surveillance that I and other members of the Task Force have conducted, as well as intercepted conversations at the FOUR RESTAURANTS, it is clear that, in addition to these four locations, there is probable cause to believe that ARDITO, the other TARGET SUBJECTS, and other members and associates of LCN as yet unknown have used, and will continue to use, locations that are impractical to specify to conduct their meetings in order to accomplish, to discuss, and to commit the offenses described in Paragraph 3 above. There is also probable cause to believe that during these meetings, ARDITO will have the ARDITO CELLPHONE with him, since he carries the ARDITO CELLPHONE with him at all times.

58. As set forth below, there are locations used by ARDITO, the other SUBJECTS, and other members and associates of LCN, that are impractical to specify to conduct their meetings in order to accomplish, to discuss, and to commit the offenses described in Paragraph 3 above, in addition to the FOUR RESTAURANTS described above. In addition, based on my training and experience conducting organized crime investigations, because the SUBJECTS are now aware of the existence of the listening devices at the AGOSTINO'S PREMISES and the MARINA PREMISES, they

54

will likely become more cautious in conducting their criminal affairs at those restaurants and will likely use other locations to conduct meetings.  Indeed, ARDITO uses various and changing locations to conduct his meetings with the other SUBJECTS and to meet with other members and associates of LCN.  Thus, interception of communications at the FOUR RESTAURANTS revealed, and would reveal if such interceptions alone were authorized, only a portion of the pertinent communications occurring among the SUBJECTS during their day-to-day meetings.  Authorizing the interception of communications at locations used by ARDITO that are impractical to specify through the listening device placed in the ARDITO CELLPHONE or other means will provide law enforcement with a more complete picture of the SUBJECTS' criminal activities.

59.  Communications among the SUBJECTS intercepted at the FOUR RESTAURANTS have confirmed that the SUBJECTS engage in numerous other meetings, and seek to meet at a variety of locations impractical to specify, in an effort to thwart law enforcement.  For example:

a.  As explained in the May 16, 2003 Affidavit, at a meeting on Monday, January 6, 2003 at the BRUNELLO PREMISES, which was recorded pursuant to the December 31, 2002 Order, the SUBJECTS explicitly discussed the need to meet at other restaurants because of a concern that their conversations at the

BUG001334

BRUNELLO PREMISES were being monitored.   This conversation among the SUBJECTS then turned to finding a place to meet where they would not be subject to electronic surveillance by law enforcement.   ARDITO said to PELUSO, "Pete, we gotta find a restaurant."   PELUSO suggested "Spoto's" (a restaurant in the Bronx), and ARDITO said, "I don't care about . . .(i/a)."   ARDITO again said, "We gotta find a different place."   DORIS said that he can't take the heat (law enforcement) in Agostino's (Restaurant).   PELUSO mentioned a restaurant near a train station.   PELUSO also suggested Francesco's on Shore Road in New Rochelle, and ARDITO agreed.   Then, referring to the Government's ability to monitor conversations electronically, DORIS said, "two miles away, they (law enforcement) can hear you."   ARDITO responded, "No they can hear ya."   PELUSO then said, "They put the . . . (i/a) two miles away, then listen and record."   ARDITO responded, "They don't have to put a bug in there."   PELUSO continued, "And they can even have a booster that they can transmit the signal farther."   This conversation establishes that the SUBJECTS are conducting meetings at other locations (specifically restaurants) during which they discuss their criminal activities.

60.   In addition to the intercepted communications described above, my belief that there are locations used by ARDITO to conduct his meetings with the other SUBJECTS and other

BUG001335

members and associates of LCN that are impractical to specify is
further supported by my conversations with CS-1. As discussed in
paragraph 47 of the December 31, 2002 Affidavit, CS-1 is a source
who has provided reliable information to the FBI about members
and associates of the Genovese LCN Family, including the
SUBJECTS. CS-1 is aware that the SUBJECTS -- ARDITO, PELUSO,
DORIS and others -- meet regularly at a variety of locations to
conduct their meetings. Most recently, CS-1 has stated that
ARDITO, PELUSO and DORIS have met on several occasions since July
9, 2003 (the date of the discovery of the listening devices) at
the La Grotta Trattoria in Yonkers, New York, which is near the
location where ARDITO's daughter lives.

61. The fact that ARDITO uses locations that are
impractical to specify to conduct his meetings with the other
TARGET SUBJECTS and other members and associates of La Cosa
Nostra is also corroborated by the physical surveillances
conducted by me and other agents.

62. The summary of physical surveillances listed in
this application is not exhaustive; the results of every
surveillance have not been included. On the following days,
other FBI agents, NYPD detectives, and I have observed the
SUBJECTS and other LCN members and associates at the following
meetings in a variety of locations:

(a) July 18, 2002: At approximately 11:33 a.m.,

57

PELUSO was observed leaving his residence in the Bronx, New York, and driving to ARDITO's home.  ARDITO and PELUSO were observed having a discussion during their trip.  They drove to the AGOSTINO'S PREMISES.  Following lunch, ARDITO and PELUSO were observed returning to PELUSO's vehicle and having an animated discussion while driving back to the Bronx.

(b) <u>August 12, 2002:</u>  At approximately 11:26 a.m., ARDITO was observed meeting with GUIDO.  ARDITO, PELUSO and DORIS then drove to Knuckleheads Restaurant, in Pelham Bay, New York.  They were observed waiting in the vehicle for several minutes, after which they entered Knuckleheads.  They left Knuckleheads a short time later and drove to the AGOSTINO'S PREMISES.

(c) <u>August 13, 2002:</u>  At approximately 11:38 a.m., ARDITO and PELUSO were observed meeting with Joe Salcito (a former union representative) and Danny Murphy (a delegate for Local 15 of the International Union of Operating Engineers who has been charged in a racketeering indictment in the Eastern District of New York in connection with the Colombo Family's extortionate control of Local 15) at Arturo's Restaurant in Queens, New York.

(d) <u>August 27, 2002:</u>  At approximately 10:45 a.m., GUIDO was surveilled meeting with ARDITO at ARDITO's residence in Queens, New York.

(e) <u>September 9, 2002:</u>  At approximately 2:57

58

BUG001337

p.m., ARDITO, PELUSO, and DORIS left the AGOSTINO'S PREMISES and drove together to Ultimate Auto in Eastchester, New York. At Ultimate Auto, ARDITO and DORIS were observed speaking with Frank Salerno.

(f)  September 12, 2002:  PELUSO and ARDITO were surveilled leaving the BRUNELLO PREMISES.  They drove together to Pasquale's Rigoletto Restaurant and sat at a table in the rear of the restaurant.

(g)  September 26, 2002:  At approximately 11:16 a.m., PELUSO was observed meeting with LOUIS MOSCATIELLO at Pelham Bay Brokerage, in the Bronx, New York.  They had a "walk and talk" -- that is, they left the premises of the Pelham Bay Brokerage and walked around the block while having a conversation.  Later on September 26, 2002, at approximately 11:58 a.m., ARDITO and PELUSO met in front of PELUSO's house and drove together to Buona Notte Restaurant, on Mulberry Street, New York, New York (the restaurant associated with Genovese capo MATTHEW IANIELLO).

(h)  October 22, 2002:  At approximately 11:34 a.m., ARDITO left his residence and picked up PELUSO.  They first drove to Mulino's Restaurant, 99 Court Street, White Plains and met with LOUIS GIGANTE (believed to be an associate of the Genovese LCN Family who is the son of MARIO GIGANTE, a soldier in the Genovese LCN Family, and nephew of Vincent Gigante, the Boss

59

BUG001338

of the Genovese LCN Family who recently pleaded guilty to criminal charges in the Eastern District of New York). ARDITO and PELUSO went to Pasquale's Rigoletto Restaurant at approximately 4:28 pm. They left the restaurant at approximately 5:05 p.m. At approximately 7:48 p.m., ARDITO and PELUSO met at the McDonald's Restaurant on Philip Avenue and East Tremont Avenue in the Bronx, which is across the street from PELUSO's residence. ARDITO and PELUSO walked outside until approximately 8:08 p.m., at which time LARRY DENTICO (who is believed to be a member of the ruling panel of the Genovese LCN Family) arrived. DENTICO, ARDITO, and PELUSO met for approximately an hour at a table in the McDonald's, until about 9:08 p.m.

(i)  October 28, 2002:  At approximately 12:14 p.m., ARDITO met with PELUSO for over an hour at Pasquale's Rigoletto Restaurant. At approximately 1:38 p.m., ARDITO met with LARRY DENTICO at Rino's Restaurant, in the Bronx, New York. After approximately three hours at Rino's, ARDITO and DENTICO exited Rino's and walked to Spoto's Restaurant, where they met PELUSO. They were observed having a conversation on the street until approximately 3:42 p.m.

(j)  October 30, 2002:  At approximately 2:46 p.m., ARDITO and PELUSO drive to Mulino's Restaurant in White Plains, New York (the restaurant at which they had previously met Louis Gigante). After apparently waiting for someone who did not

60

BUG001339

arrive, they left.

(k)  November 15, 2002:  At approximately 11:35 a.m.,
ARDITO and PELUSO met at the McDonald's across from PELUSO's
residence.  They met for approximately 25 minutes, until 12:01
p.m.  ARDITO then drove to his daughter's home in Yonkers, New
York, where he met VINNY RUSSO.  ARDITO, PELUSO, and RUSSO then
met at Franella Tratoria Restaurant, in Eastchester, New York.
They met there for approximately three hours, from 1:04 p.m.
until 3:57 p.m.

(1)  December 13, 2002:  At approximately 11:47 a.m.,
PELUSO arrived at the home of ARDITO's daughter, where cars
registered to ARDITO and RUSSO were already parked.  They met
together until approximately 2:30 p.m.

(m)  December 16, 2002:  At approximately 12:21 p.m.,
ARDITO, PELUSO, and DORIS met at ARDITO's residence and drove in
DORIS' car to the Parkside Restaurant in Queens, New York (the
restaurant owned by Genovese capo ANTHONY FEDERICI).  They met
there until approximately 2:36 p.m.  Later that day, PELUSO and
ARDITO were observed having a conversation in PELUSO's vehicle as
they traveled to a meeting with an unidentified individual at the
Louis Seafood Restaurant, in the Bronx, New York.

(n)  December 19, 2002:  At approximately 2:58 p.m.,
ARDITO met with an unidentified male until 4:10 p.m. at
Pasquale's Rigoletto Restaurant.

BUG001340

(o)   January 6, 2003:   At approximately 2:12 p.m., PELUSO and ARDITO met at Pasquale's Rigoletto and drove to Fiorino Jewelers, in the Bronx, New York.  Once there, they spoke on the sidewalk with GERALD FIORINO (brother-in-law of Barney Bellomo, former acting boss of the Genovese LCN Family).

(p)   January 22, 2003:   At approximately 10:00 a.m., ARDITO and PELUSO drove to 720 Post Road, Eastchester, New York, to the offices of Drs. George and Jeffrey Shapiro.  Based on intercepted conversations that occurred around the time of this meeting, I believe that they met or attempted to meet with Genovese soldier MARIO GIGANTE at the doctor's office.  ARDITO and PELUSO later traveled to Pasquale's Rigoletto from 12:27 p.m. until 12:54 p.m.

(q)   January 31, 2003:   From approximately 2:41 p.m. until 4:20 p.m., PELUSO was observed meeting with FIORINO at Fiorino Jewelers.

(r)   March 22, 2003:  ARDITO met with DOMINICK CIRILLO (former acting boss of the Genovese LCN Family) at a bar inside the Sea Shore Restaurant from approximately 12:13 p.m. until 1:27 p.m.[11]

---

[11]     Although I believe that ARDITO and the other subjects continued meeting at other locations in addition to the FOUR RESTAURANTS during the period from January through July 2003, there are few additional surveillances of meetings outside of the FOUR RESTAURANTS during this period because the resources of the FBI task force were focused on conducting surveillances and intercepting communications occurring at the FOUR RESTAURANTS.

BUG001341

(s)   June 27, 2003: At approximately 12:43 p.m., ARDITO met DOMINICK CIRILLO at the Sea Shore Restaurant, City Island, New York.

(t)   July 1, 2003:  At approximately 2:27 p.m., ARDITO and PELUSO traveled together to Pasquale's Rigoletto, where they met TOMAS TERRACIANO at the rear door and entered together.

(u)   August 11, 2003:  At approximately 1:53 p.m., cars that I recognized as belonging to ARDITO, PELUSO and DORIS were observed in the marina parking lot near where DORIS's boat is docked in the New Rochelle, New York.   ARDITO, PELUSO, and DORIS were observed leaving the boat at approximately 3:31 p.m.

(v)   August 25, 2003:    At approximately 11:53 a.m., ARDITO was observed parking at the marina in New Rochelle, New York, near the location where DORIS' boat is located.   At approximately 1:53 p.m., the car recognized by the surveilling agent as belonging to the individual known as "Al the Electrician"[12] was observed at the marina, parked next to ARDITO's car.   At 4:53 p.m., ARDITO and "Al the Electrician" left the boat.

63.   Between July 2002 through August 2003, in addition to surveillances of meetings occuring at the FOUR RESTAURANTS, members of the FBI task force have conducted surveillances of

────────────────

[12]   "Al the Electrician" is believed to be an associate of the Genovese LCN Family who was present at the meeting when ARDITO and several of the other SUBJECTS found one of the listening devices.

63

BUG001342

ARDITO and the other SUBJECTS on approximately twenty-one occasions, which are described above in paragraphs 62(a) through (v). From these surveillances, we have observed that ARDITO has, in fact, used locations that are impractical to specify to meet with the other SUBJECTS. ARDITO has had meetings at approximately twenty different locations during those twenty-one surveillances. The locations at which these meetings have been held include the inside of cars, on the street as part of a "walk and talk," at approximately twelve different restaurants (in addition to the FOUR RESTAURANTS), at a jewelry store, an auto store, a doctor's office, and on a boat.

64. Based on the foregoing results of physical surveillances, as well as on my experience in this and other LCN investigations and source information, I believe that ARDITO is using locations in addition to the FOUR RESTAURANTS that are impractical to specify to conduct his meetings with the SUBJECTS and with other members and associates of LCN. These locations that are impractical to specify are being used to discuss LCN activities, including extortionate control of retail and construction businesses, loansharking, labor bribery, as well as other offenses including check cashing fraud and medical billing fraud.

65. Furthermore, there is probable cause to believe that ARDITO will have the ARDITO CELLPHONE with him during his

BUG001343

meetings at various and changing locations with the other
SUBJECTS.  My belief is based on the following:

        a.   I have obtained records from Nextel
Communications indicating that ARDITO has only one cellphone,
which is the ARDITO CELLPHONE.  ARDITO continues to use the
ARDITO CELLPHONE to the present.

        b.   According to CS-1, ARDITO carries the ARDITO
CELLPHONE with him at all times, and regularly uses it.

        c.   I have reviewed numerous interceptions of
oral communications of meetings involving ARDITO and other
SUBJECTS at the BRUNELLO PREMISES, AGOSTINO's PREMISES, MARIO'S
PREMISES, and the MARINA PREMISES.  During many of these
meetings, ARDITO makes, or receives, calls on the ARDITO
CELLPHONE.  For example, during the period from March 27, 2003
through July 3, 2003, at meetings during which the FBI
intercepted oral communications at one of the FOUR RESTAURANTS,
ARDITO placed or received calls on the ARDITO CELLPHONE 18 times.
Moreover, on July 3, 2003, ARDITO and Kathy Ivelli were
intercepted at the MARINA PREMISES entering numbers from ARDITO'S
pocket phone book into the database in the ARDITO CELLPHONE so
that ARDITO would no longer have to carry his pocket phone book
with him every day.

BUG001344

**F.** **Unavailability of Alternative Investigative Techniques**

66. For the following reasons, normal investigative techniques have been tried without success, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous to employ:

(a) As set forth in detail in the prior affidavits, the confidential sources of information described herein do not know all of the details of the SUBJECTS' criminal conduct believed by your affiant to be necessary to ensure a successful prosecution of the SUBJECTS. Although CS-1 has overheard some of the SUBJECTS' meetings, CS-1 is not privy to the full scope of the illegal activities being discussed by the SUBJECTS, nor is CS-1 present or able to overhear all of the SUBJECTS' discussions at the various and changing locations at which those meetings are conducted. Moreover, CS-1 is not willing to wear recording devices nor is CS-1 willing to testify, as CS-1 fears for CS-1's safety. Similarly, although CS-2 has observed the SUBJECTS meeting regularly within the MARIO'S PREMISES, CS-2 has not been able to overhear the SUBJECTS' conversations. Finally, CS-3 has provided only limited information about one meeting involving the SUBJECTS at the AGOSTINO'S PREMISES, but was not present during that meeting or any other meetings among the SUBJECTS. No additional confidential sources of information are currently available in

BUG001345

this investigation.

(b)   As set forth in detail in the prior affidavits, physical surveillance of the SUBJECTS provides only limited evidence as to their illegal activities.  Physical surveillance, in and of itself, is useful mainly in placing individuals together, but provides limited evidence of the purpose of their meetings or the content of their conversations. For example, physical surveillance has permitted law enforcement to identify SUBJECTS JOHN "BUSTER" ARDITO, PETER PELUSO, MICHAEL DORIS, VINNY RUSSO, ANTHONY GUIDO, JOHN PALADINO, ABISH LAJQI, GERALD FIORINO, LARRY DENTICO, DOMINICK CIRILLO, TOMAS TERRACIANO, LOUIS MOSCATIELLO, KATHY IVELLI, ANTHONY ASCENZIA, JR., JOHN ALBANESE, MARIO GIGANTE, and LOUIS GIGANTE, JR. and others on numerous occasions at a variety of locations, but was unable to ascertain the subject matter of their conversations. Thus, the physical surveillance in this investigation has been helpful in placing people with each other, but has provided limited evidence of the purpose of the meetings or the content of their conversations.  Moreover, physical surveillance is met with only limited success when the targets of the surveillance are conscious of surveillance and take steps to evade the surveillance.  For example, as set forth in the March 3, 2003 Affidavit, and as described above, communications intercepted at the FOUR RESTAURANTS have established that the SUBJECTS are

67

extremely sensitive about surveillance and have been aware of surveillance conducted by agents in this investigation.  The information that will be gained from electronic surveillance will assist in establishing the roles of individuals associated together, the nature of their activities, the location of physical evidence and the like.  In addition, with the knowledge provided beforehand by electronic surveillance that a meeting is to take place at a given location, it may be possible to establish physical surveillance at that location in advance, thereby minimizing the risk of discovery inherent in following the SUBJECTS or remaining in the vicinity of target locations for long periods of time.

(c)  As set forth in detail in the prior affidavits, use of a federal Grand Jury, as discussed with the Assistant United States Attorneys working on this investigation, does not, at this time, appear to be a promising method of investigation.  The witnesses who could chiefly provide evidence to the Grand Jury as to the illegal activities and the identities of the racketeering enterprise members are, themselves, the identified members of the racketeering enterprise and of LCN generally.  All of these individuals face prosecution; it is unlikely, therefore, that any of them would testify voluntarily.  Nor would it be desirable at this time to seek immunity for any of the known members of the racketeering enterprise in order to

68

compel their testimony.  Immunizing them could foreclose the possible prosecution of the most culpable persons, and would thwart the public policy that they be held accountable for their illegal activities.  Moreover, immunizing the witnesses cannot ensure the production of truthful testimony, and it is likely that these individuals would refuse to testify in contempt of Court, particularly in view of their ties to LCN.  In any event, the granting of immunity is premature until the full scope of the illegal activities described above is known.  The issuance of Grand Jury subpoenas to other individuals likewise would not likely lead to the discovery of critical information and undoubtedly would alert members of the racketeering enterprise to the existence and scope of the investigation, possibly causing the SUBJECTS to flee or to go into hiding, destroy evidence, threaten known or suspected Government agents or informants, or otherwise adversely affect the Government's investigation.

(d)  As set forth in detail in the prior affidavits, applications for search warrants would appear to be premature at this stage of the investigation because, among other reasons, the results of searches would not be likely to identify unknown conspiracy members or to describe fully the nature and extent of the illegal activities of the SUBJECTS.  Moreover, a search would inevitably tip-off targets of this investigation.

(e)  As set forth in detail in the prior

69

affidavits, based on my experience, an undercover operation is not feasible due, in part, to the unwillingness of the SUBJECTS to deal extensively with outsiders who are not members or associates of LCN and are neither friends nor acquaintances of Genovese LCN Family members or associates. Moreover, it also would cast suspicion upon -- and consequently endanger -- any informant who might attempt to introduce into the organization an outsider, whom the SUBJECTS might suspect is an undercover Special Agent. As described in the December 31, 2002 Affidavit, a Special Agent in an undercover role was able to overhear parts of a conversation between the SUBJECTS at one of the FOUR RESTAURANTS, but the Agent's overhear was incomplete and constituted far from the full breadth of the SUBJECTS' discussion. Moreover, if the same Agent were to begin to sit in close proximity to the SUBJECTS on a regular basis, it would unquestionably raise the SUBJECTS' suspicions and potentially compromise the investigation. As a result, it would be extremely difficult, and dangerous, to attempt to penetrate the organization with an undercover Special Agent and the likelihood of successfully doing so is remote at best.

(f)    As set forth in detail in the prior affidavits, interviews of the SUBJECTS do not appear to be a promising avenue of investigation. Based on my experience and the experience of other Special Agents of the FBI, I believe that

70

any interviews of the SUBJECTS or the LCN members they have met with would not be successful. Moreover, interviews of any of the SUBJECTS or of other LCN members and associates would likely be counterproductive as the interviews might alert them and the SUBJECTS to the covert investigation. In addition, because of their culpability, there is no reason for the SUBJECTS to provide information unless confronted with facts that would encourage them to provide truthful information. Failing that, they are likely to invoke their privilege against self-incrimination. Interviews would also place the SUBJECTS on notice of the scope of the investigation. Interviews of victims of the extortions would not likely be fruitful because many of them have not yet been identified. Moreover, many of the business owners and union officials who may be able to provide information appear to be confederates of the SUBJECTS and, because of fear of reprisals from the SUBJECTS, would not be likely to provide truthful information, and the interviews may result in the disclosure to the SUBJECTS of the existence of the investigation.

(g) As set forth above, electronic surveillance in this case has revealed that ARDITO and PELUSO have used cellphones. Agents have obtained authorization to intercept, and in fact intercepted, communications over PELUSO's cellphone pursuant to the June 18, 2003 Order from June 18, 2003 through July 17, 2003. However, those interceptions, while helpful to

71

BUG001350

law enforcement, provided a very limited picture of PELUSO's and the other SUBJECTS' criminal activities.  PELUSO and the other individuals with whom he spoke were extremely careful and guarded on the cellphone, recognizing the potential for electronic interception.  Accordingly, under these circumstances, the interception of PELUSO's cellphone would not provide law enforcement with detailed information about the SUBJECTS' criminal activities.  Moreover, telephone toll records and pen register devices show only that a conversation occurred.  They do not reveal the topics discussed, the contents of the communications, or the identities of the actual participants.

(h)  Furthermore, although agents have previously intercepted communications occurring at the FOUR RESTAURANTS, those communications have revealed only part of the SUBJECTS' criminal activities.  As set forth above, the SUBJECTS conduct their meetings not just at the FOUR RESTAURANTS, but at numerous other restaurants and locations that are impractical to specify, including in cars, during "walk and talks" on the street, and in offices.  Based on my training and experience, and, as corroborated by the interceptions at the FOUR RESTAURANTS, the SUBJECTS are extremely conscious of the possibility of law enforcement surveillance, and therefore have meetings at locations at which they believe the likelihood of electronic interception is reduced, such as on the street or in public

72

restaurants.   Indeed, the SUBJECTS in this case are now aware of
the listening devices at the AGOSTINO'S PREMISES and the MARINA
PREMISES, as well as the existence of an investigation by law
enforcement into their activities.   Although they continue to
meet at the FOUR RESTAURANTS (as set forth above, most recently
as of August 20, 2003 at the AGOSTINO'S PREMISES), they are even
more likely to be cautious in conducting their meetings in
furtherance of their racketeering enterprise as a result of their
discovery of the listening devices.   In sum, based on my training
and experience, and my knowledge of this investigation, I believe
that ARDITO and the other SUBJECTS regularly meet at locations
that are impractical to specify in an effort to thwart law
enforcement's ability to intercept their criminal conversations.
Because of their use of locations that are impractical to
specify, the FBI could not obtain Title III authorization to
intercept the SUBJECTS' communications at all of the different
locations at which they meet in order to understand fully their
criminal activities.   Accordingly, the authorization to intercept
oral communications at the FOUR RESTAURANTS and of ARDITO at
locations that are impractical to specify will enable the FBI to
get a more complete understanding of the SUBJECTS' criminal
activities and their involvement in the Genovese LCN Family, and
to defeat their constant attempts to evade law enforcement
scrutiny.

73

BUG001352

(i)   Although an April 22, 2003 order issued by the United States District Court for the District of Connecticut authorized the interception of wire communications in which JOHN ARDITO is named as a target subject (the "Connecticut Order"), this wire interception will be of minimal assistance to this investigation.  First, the other SUBJECTS in this investigation are not named as target subjects with respect to the Connecticut Order, so interceptions pursuant to the Connecticut Order are unlikely to be of much assistance with respect to the relationship between the SUBJECTS in this investigation, and their criminal activity.  Moreover, the FBI believes that, although ARDITO was named as a subject in the Connecticut Order, the focus of the Connecticut Order is on other individuals, including Pasquale "Scop" Deluca (believed to be a rival of ARDITO's with regard to his control over certain interests of the Genovese LCN Family in Connecticut), rather than on ARDITO and his crew.

67.   For the above reasons, it is believed that the only means by which the full scope of the SUBJECTS' ongoing criminal activities can be ascertained is by the interception of the SUBJECTS' oral communications as applied for herewith.

### III.   CONCLUSION

#### A.   Personnel

68.   As noted above, this case is being investigated by

74

the Joint Organized Crime Task Force of the NYPD and FBI. It is
anticipated that, during the requested electronic surveillance,
all monitoring will be performed and supervised by Special Agents
of the FBI and Special Federal Officers.

B.    **Minimization**

69.    All interceptions of oral communications occurring
at the FOUR RESTAURANTS and at the various and changing locations
used by ARDITO will be minimized in accordance with Chapter 119
of Title 18, United States Code. The Special Agents of the FBI
and Special Federal Officers who are to carry out the requested
interceptions of oral communications will be instructed
concerning the steps that they should take to minimize the
interceptions. Any interception will cease when it is determined
that the monitored conversation is not criminal in nature or that
none of the named interceptees or other co-conspirators is a
party to the conversation. The agents and officers will be
permitted to spot check to determine whether a minimized
conversation has turned criminal in nature. Moreover, when
intercepting conversations at the locations used by JOHN "BUSTER"
ARDITO that are impractical to specify pursuant to Title 18,
United States Code, Section 2518(11)(a)(iii), no interception
will begin until the agents and officers conducting the
interception have reason to believe, through physical
surveillance, source information, prior interceptions or conduct,

75

BUG001354

or other facts revealed during the course of the investigation, that ARDITO and other SUBJECTS or other members and associates of LCN are engaging in conversations regarding the SUBJECT OFFENSES.

70. It is requested that the order authorizing interception of oral communications provide that, if necessary, translators be authorized to assist in conducting this surveillance and to receive disclosure of intercepted communications. Certain of the SUBJECTS are expected to communicate with each other in the Italian language. It may therefore be necessary to secure the services of translators in order to assist Agents in monitoring and translating the intercepted communications. All such translators will be under contract to the FBI and will be directly supervised by the FBI and deputized law enforcement officers of the NYPD. It is further requested, pursuant to Title 18, United States Code, Section 2518(5), that, in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

## C.   **Period of Interception**

71. The information set forth in this affidavit establishes, among other things, probable cause to believe that: JOHN "BUSTER" ARDITO, PETER PELUSO, MICHAEL DORIS, VINNY RUSSO,

BUG001355

ANTHONY GUIDO, JOHN PALADINO, ALBERT FACCHIANO, MICHAEL "HIPPY" ZANFARDINO, SALVATORE LARCA, RICHARD SERVIDIO, ABISH LAJQI, ANDREW RIBUSTELLO, ERNEST MUSCARELLA, GERALD FIORINO, PHILLIP BUONO, DOMINICK DEVITO, RONALD CACCIATORE, LARRY DENTICO, DOMINICK CIRILLO, PAT SIMONE, TOMAS TERRACIANO, JOHN LAMAGNA, JOHN PISTONE, LOUIS MOSCATIELLO, MATTHEW IANIELLO, ANTHONY FEDERICI, JOSEPH SALCITO, KATHY IVELLI, SONNY MARKS, GUS CURCIO, ANTHONY ASCENZIA, JR., ARTHUR NIGRO, JOHN ALBANESE, MARIO GIGANTE, LOUIS GIGANTE, JR. and others as yet unknown, will discuss and engage in criminal activity at the FOUR RESTAURANTS and at locations used by ARDITO that are impractical to specify.

72. IT IS HEREBY REQUESTED that an order be issued authorizing Special Agents of the FBI and Special Federal Officers to intercept oral communications occurring at the FOUR RESTAURANTS and at locations used by ARDITO that are impractical to specify concerning the affairs of the enterprise described herein and the SUBJECTS' commission of the above-described offenses. Because the offenses described herein are continuing in nature and are likely to continue after the initial interception of the particular communications that are the objects of this request, it is requested that the Court's order authorizing interception of oral communications not be required to terminate automatically when the types of communications described above have first been obtained, but be permitted to

77

BUG001356

continue until all oral communications are intercepted that reveal fully the manner in which the SUBJECTS, and others as yet unknown, participate in the above-described offenses, or until the accomplishment of the objectives set forth in ¶ 13, supra, or for a period of thirty (30) days, whichever is earlier. The 30-day period shall be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten days from the date of this Court's Order.

73. IT IS HEREBY REQUESTED that an order be issued authorizing Special Agents of the FBI and Special Federal Officers to intercept oral communications both in the Southern District of New York and outside this jurisdiction but within the United States through the use of a "mobile interception device" pursuant to Title 18, United States Code, Section 2518(3). As described above, ARDITO engages in criminal conversations at locations in the Southern District of New York and in other jurisdictions that are impractical to specify. The ARDITO CELLPHONE, which ARDITO carries with him on his person, therefore constitutes a mobile interception device as set forth in Title 18, United States Code, Section 2518(3). The Court will be advised of the locations (and Districts) of the interceptions.

74. IT IS HEREBY REQUESTED that Special Agents of the FBI, detectives of the NYPD, and employees of the FBI possessing

78

required technical expertise be permitted to enter onto private property and to effect surreptitious entry onto locations for the purpose of effectuating this order, including installing, maintaining, and removing any electronic interception devices to be used in accomplishing the proposed interception of oral communications at the FOUR RESTAURANTS and at locations used by ARDITO that are impractical to specify. The Court will be notified as soon as practicable after each such entry.

WILLIAM INZERILLO
Special Agent
Federal Bureau of Investigation

Sworn to before me this
3rd day of September, 2003

UNITED STATES DISTRICT JUDGE

79

BUG001358